No. 98-612

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 110

299 Mont. 321

2 P. 3d 806

IN THE MATTER OF THE RULES OF

PROFESSIONAL CONDUCT AND INSURER

IMPOSED BILLING RULES AND PROCEDURES

UGRIN, ALEXANDER, ZADICK & HIGGINS, P.C.,

and JAMES, GRAY, BRONSON & SWANBERG, P.C.,

Petitioners.

ORIGINAL PROCEEDING:  Declaratory Relief

COUNSEL OF RECORD:

For Petitioners:

Neil E. Ugrin (argued) Gary M. Zadick (argued); Ugrin, Alexander, Zadick & Higgins, Great Falls, Montana

Robert James (argued) , Bert Fairclough (argued); James, Gray, Bronson & Swanberg, Great Falls, Montana

For Respondents:

Ronald F. Waterman, Thomas E. Hattersley, III; Gough, Shanahan, Johnson

& Waterman, Helena, Montana

Lloyd E. Williams, Jr. (argued), David E. Morgans; Williams & Montgomery,

Chicago, Illinois

Lawrence R. Samuels, Jacquelyn F. Kidder, Robert L. Carter; Ross & Hardies,

Chicago, Illinois (for St. Paul Fire and Marine Insurance Company, USF&G Company,
TIG Insurance Company)

Thomas M. Welsch; Poore, Roth & Robinson, Butte, Montana

William T. Barker, Jeffrey P. Lennard, Tracy T. Segal; Sonnenschein, Nath

& Rosenthal, Chicago, Illinois (for Allstate Insurance Company, Zurich

American Insurance Company, Universal Underwriters Insurance Company)

For Amicus Curiae Supporting Petitioners:

Sam E. Haddon, Esq. (argued), Missoula, Montana; Rockwood Brown, Esq. (argued),
Billings, Montana (for Montana Defense Trial Lawyers)

Steven H. Gurnee, Esq., San Francisco, California (for Association of Defense

Counsel of Northern California); Robert A. Davidson, Esq., Los Angeles,

California (for Association of Southern California Defense Counsel)

Mark L. Stermitz, Esq., Missoula, Montana (for Montana Appleseed Center

for Law & Justice, Inc.)

Brian M. Morris; Goetz, Gallik, Baldwin & Dolan, Bozeman, Montana;

Elizabeth Brennan; Rossbach Brennan, Missoula, Montana; Patricia O'Brien

Cotter (argued); Cotter & Cotter, Great Falls, Montana (for Montana Trial

Lawyers Association)

For Amicus Curiae Supporting Respondents:

Jacqueline T. Lenmark; Keller, Reynolds, Drake, Johnson & Gillespie,

Helena, Montana (for American Insurance Association)

Charles Silver, Esq., University of Texas School of Law, Austin, Texas

(on his own behalf)

Allen B. Chronister; Chronister, Moreen & Larson, Helena, Montana; John

S. Piece, David J. McMahon, Gary A. Bresee; Barger & Wolen, San

Francisco, California (for Legalguard, Inc.)

Mark D. Parker; Parker Law Firm, Billings, Montana (for National

Association of Independent Insurers)

---

Argued and Submitted: September 28, 1999

Decided: April 28, 2000

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 In an original application for declaratory judgment, Petitioners assert that insurer-imposed billing rules and procedures violate the Rules of Professional Conduct.

¶2 We address the following issues:

¶3 1. May an attorney licensed to practice law in Montana, or admitted pro hac vice, agree to abide by an insurer's billing and practice rules which impose conditions limiting or directing the scope and extent of the representation of his or her client, the insured?

¶4 2. May an attorney licensed to practice law in Montana, or admitted pro hac vice, be required to submit detailed descriptions of professional services to outside persons or entities without first obtaining the informed consent of his or her client and do so without violating client confidentiality?

Factual and Procedural Background

¶5 In June, 1985 we adopted the Rules of Professional Conduct "as rules governing the conduct of persons admitted to practice law before this Court and all state courts in the State of Montana." In November, 1998 Petitioners filed an application for original jurisdiction and declaratory relief. Petitioners requested a declaratory ruling on two issues: 1. May an attorney licensed to practice law in Montana, or admitted pro hac vice, agree to abide by an insurer's billing and practice rules which impose conditions limiting or directing the scope and extent of the representation of his or her client, the insured? 2. May an attorney licensed to practice law in Montana, or admitted pro hac vice, be required to submit detailed descriptions of professional services to outside persons or entities without first obtaining the informed consent of his or her client and do so without violating client confidentiality?

¶6 We accepted original jurisdiction. We ordered that Petitioners identify insurers doing business in Montana whom they sought to have bound by this Court's determination of the issues, that the insurers (Respondents) file copies of the billing rules that they enforce in Montana, directly or through an auditing agency, and that the parties advise the Court

whether they needed an evidentiary hearing.

¶7 Respondents moved this Court for an evidentiary hearing and Petitioners filed a brief in opposition. In March, 1999 we issued an order denying the request for an evidentiary hearing but allowing Respondents to jointly file an expert opinion. In September, 1999 this matter was argued before the Court.

## Discussion

¶8 As a preliminary matter, we note that Respondents argue that this Court erred in accepting original jurisdiction of this case and in denying their request for an evidentiary hearing. Respondents argue in part that there is no justiciable case, that the Petitioners lack standing, and that there is no issue of statewide importance.

¶9 Respondents' arguments are wholly without merit. We have a constitutional mandate to fashion and interpret the Rules of Professional Conduct. *See* Article VII, Section 2 of Montana's Constitution, providing that "[the supreme court] may make rules governing appellate procedure, practice and procedure for all other courts, admission to the bar and the conduct of its members." Art. VII, Sec. 2(3), Mont. Const. *Compare* §§ 37-61-101, MCA, et. seq (providing procedures for licensing and regulation of members of Montana's bar). Further, whether insurers' billing and practice rules conflict with the Rules of Professional Conduct is a question of law that requires no evidentiary hearing. The tension between insurers' billing and practice rules and the Rules of Professional Conduct presents an appearance of impropriety that is a sufficient basis for this Court to exercise its inherent powers and its Constitutional mandate to address the issues presented here. *Compare* Bergeron v. Mackler (Conn. 1993), 623 A.2d 489, 494 (recognizing that "considering the appearance of impropriety may be part of the inherent power of the court to regulate the conduct of attorneys"); First American Carriers v. Kroger Co. (Ark. 1990), 787 S.W.2d 669, 671 (concluding "fact that Canon 9 [which provided that lawyers should avoid appearance of impropriety] is not in the Model Rules does not mean that lawyers no longer have to avoid the appearance of impropriety"); Matter of Weinroth (N.J. 1985), 495 A.2d 417, 421 (citations omitted) (concluding " 'even the appearance of impropriety' that casts doubt upon the integrity of the legal process must be avoided").

¶10 Moreover, Respondents' contentions that the issues presented in this case are not of statewide importance and that no urgency attends them are belied by the numerous amici briefs and expert opinions that Respondents have submitted. Nor is Respondents'

contention that Petitioners lack standing tenable. Petitioners clearly have a personal stake in the issue whether their compliance with insurers' billing and practice rules violates the Rules of Professional Conduct. Finally, Respondents' claim that they have not had notice and an opportunity to respond are flatly contradicted by the more than 1000 pages of affidavits, expert opinions, and billing and practice rules that they have filed with this Court, not to mention the numerous supporting amicus curiae briefs that also have been filed.

¶11 May an attorney licensed to practice law in Montana, or admitted pro hac vice, agree to abide by an insurer's billing and practice rules which impose conditions limiting or directing the scope and extent of the representation of his or her client, the insured?

¶12 In addressing this issue, there are several Rules of Professional Conduct that we keep in mind.

¶13 Rule 1.1 provides: **"Competence**. A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Rule 1.1, M.R.Prof.Conduct.

¶14 Rule 1.8 provides in pertinent part:

> **Conflict of Interest, Prohibited Transactions**
>
> . . . .
>
> (f)  A lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> (1) the client consents after consultation;
>
> (2) there is *no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship*; and
>
> (3) information relating to representation of a client is protected as required by Rule 1.6.

Rule 1.8, M.R.Prof.Conduct (emphasis added).

¶15 Rule 2.1 provides in part: "**Advisor**. In representing a client, a lawyer shall exercise independent professional judgment and render candid advice." Rule 2.1, M.R.Prof. Conduct. Rule 5.4 provides in pertinent part: "**Professional Independence of a Lawyer** . . . . (c) A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services." Rule 5.4, M.R.Prof.Conduct.

¶16 In the present case, the parties do not dispute that insurers' billing and practice rules typically "impose conditions [upon an attorney appointed by an insurer to represent an insured] limiting or directing the scope and extent of the representation of his or her client." The Petitioners have focussed on the requirement of prior approval in insurers' billing and practice rules. We therefore address that condition of representation while recognizing that other conditions limiting or directing the scope and extent of representation of a client may also implicate the Rules of Professional Conduct.

¶17 As a representative set of litigation guidelines, we briefly consider the guidelines submitted by the St. Paul Companies (hereafter, St. Paul). The declared policy of St. Paul's Litigation Management Plan (hereafter, the Plan) is to "[p]rovide a systematic and appropriate defense for St. Paul and its insureds, and to vigorously defend nonmeritorious claims and claims where the demands are excessive."

¶18 St. Paul promotes a "team" approach to litigation in which each member has distinct responsibilities. The claim professional is "responsible for disposition of claims, whether in suit or not. We expect the St. Paul claim professional to take the lead in initiating settlement negotiations . . . . We also expect the claim professional to have significant input into development of the litigation strategy (i.e., settle or try)." The Plan also "recognizes that defense counsel's primary responsibility and obligation are to protect and further the interests of the insured in the conduct of the litigation. Our goal is to cooperate with the insured and defense counsel to achieve the best result possible."

¶19 However, the Plan states that "[m]otion practice, discovery and research are items that have historically caused us some concern and which we plan to monitor closely. While we foresee very few differences of opinion, *we require that defense counsel secure the consent of the claim professional prior to scheduling depositions, undertaking research, employing experts or preparing motions*" (emphasis added).

¶20 Thus, the Plan expressly requires prior approval before a defense attorney may

undertake to schedule depositions, conduct research, employ experts, or prepare motions. The Plan concludes that "[w]e understand that any conflicts between the St. Paul Litigation Management Plan and the exercise of your independent judgment to protect the interests of the insured must be resolved in favor of the insured. We expect, however, to be given an opportunity to resolve any such conflicts with you before you take any action that is in substantial contravention of the Plan."

*A. Whether Montana has recognized the dual representation doctrine under the Montana Rules of Professional Conduct.*

¶21 Petitioners assert that the insured is the sole client of a defense attorney appointed by an insurer to represent an insured pursuant to an insurance policy (hereafter, defense counsel) and that a requirement of prior approval in insurance billing and practice rules impermissibly interferes with a defense counsel's exercise of his independent judgment and his duty of undivided loyalty to his client. Petitioners argue that because the relationship of insurer and insured is permeated with potential conflicts, they cannot be co-clients of defense counsel.

¶22 Respondents argue that under Montana law, the rule is that in the absence of a real conflict, the insurer and insured are dual clients of defense counsel. From this fundamental premise, Respondents argue that as a co-client of defense counsel, the insurer may require pre-approval of attorney activities to assure adequate consultation. Respondents argue further that defense counsel must abide by a client's decisions about the objectives of representation and that defense counsel are obliged to consult with a client about the means for the objectives of representation. Respondents also argue that under Montana law, an insurer is vicariously liable for the conduct of defense counsel and that an insurer's control of litigation justifies holding an insurer vicariously liable for the conduct of defense counsel.

¶23 We conclude that Respondents have misconstrued our past decisions. This Court has not held that under the Rules of Professional Conduct, an insurer and an insured are co-clients of defense counsel. The Montana decisions chiefly relied upon by Respondents are inapposite because each one concerns situations where the insurer had "absolute" control of the litigation. None of the Montana decisions cited by Respondents addresses whether an insurer is a co-client under the Rules of Professional Conduct.

¶24 The central case underlying the Montana decisions cited by Respondents is Jessen v.

O'Daniel (D.Mont. 1962), 210 F.Supp. 317. *Jessen* concerned a bad faith action brought by an insured against his insurer following underlying litigation in which the insurer had hired an attorney to represent its interests and those of its insured. Further, there was "the unique situation of the insured paying a fee to the attorney selected by the insurer, to do what in effect the attorney was already required to do under his contract of employment by the insurance company." *Jessen*, 210 F.Supp. at 331. In the course of negotiations between the parties in the underlying litigation, the insurer's attorney failed to communicate all of the offers that the parties made to each other. The court in *Jessen* found that "[h]ad [the attorney] communicated the respective offers to the other parties, the case would probably have been settled." *Jessen*, 210 F.Supp. at 324.

¶25 The insurer in *Jessen* argued that the attorney was "acting as a mutual attorney or agent for both [the insurer] and [the insured], and accordingly 'neither party can be held accountable for knowledge that the mutual attorney had, but did not transfer to the other parties or to either of them.' " *Jessen*, 210 F.Supp. at 330. The court in *Jessen* acknowledged a conflict in the authorities regarding whether "the insurance carrier becomes an agent of the insured with respect to settlement and trial, or is in the nature of an independent contractor." *Jessen*, 210 F.Supp. at 331 (citations omitted). However, the court concluded that

> The *precise relationship is unimportant*. The authorities agree that *these provisions of the contract* have the effect of placing absolute and exclusive control over the litigation in the insurance carrier, with "the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interests of the parties."

*Jessen, 210 F.Supp. at 331 (citation omitted) (emphasis added). The Jessen court concluded that "[t] here can be no question that in the absence of the special fee arrangement[1] with [the insured], [the attorney's] conduct and knowledge would be imputed to [the insurer]. Under the circumstances here, the special [fee] arrangement cannot relieve [the insurer] from its responsibility for [the attorney's] conduct in failing to disclose the various offers to the respective parties." Jessen, 210 F.Supp. at 332.*

¶26 The court in *Jessen* emphasized the complete control over litigation that the insurer held under the insurance contract. *Jessen* did not address whether the attorney's compliance with that contract violated the Rules of Professional Conduct. Nor did *Jessen* determine whether the insured and the insurer were co-clients under the Rules of Professional Conduct.

¶27 As Respondents point out, subsequent Montana decisions have recognized *Jessen's* conclusion that an insurance contract may place absolute control of litigation in the hands of the insurer. In Safeco Ins. Co. v. Ellinghouse (1986), 223 Mont. 239, 725 P.2d 217, the Court rejected an insurer's claim that because the attorney it hired was an independent contractor, the insurer was not responsible for the mistakes of the attorney. Relying on *Jessen*, the Court in *Ellinghouse* concluded that "[t]he provisions of an insurance contract which give the insurance company the right and impose a correlative duty to defend suits against the insured have the effect of placing absolute and exclusive control over the litigation in the insurance carrier." *Ellinghouse*, 223 Mont. at 252-53, 725 P.2d at 226 (citations omitted).

¶28 Similarly, in State v. Second Judicial Dist. Court (1989), 240 Mont. 5, 783 P.2d 911, the Court considered whether communication between an insurer and its attorneys, which occurred after litigation began, was privileged from disclosure in a bad faith action. Citing *Jessen* and *Ellinghouse*, the Court determined that "[a]bsent a conflict of interest, the attorney hired by the insurance company to defend its insured, represents both." *Second Judicial Dist. Court*, 240 Mont. at 10, 783 P.2d at 914. We note, however, that the Court considered client identity only in determining whether insurer-defense counsel communications were privileged.

¶29 In Tigart v. Thompson (1990), 244 Mont. 156, 796 P.2d 582, the district court granted plaintiff's motions for a new trial and attorney fees and costs under § 37-61-421, MCA. The insurer appealed the award of attorney fees and costs, arguing in part that it was not a "party" under § 37-61-421, MCA. The Court in *Tigart* noted the *Jessen* court's determination that insurance contracts place exclusive control of the litigation in the insurer and concluded that "[i]f an insurer may be held liable for the actions of its attorney, as was the case in *Ellinghouse*, under a theory of agency, it is axiomatic that the insurer may be responsible for costs, expenses and attorney fees when the insurer 'multiplies the proceedings in any case unreasonably and vexatiously.' " *Tigart*, 244 Mont. at 160, 796 P.2d at 585. Thus, relying on *Jessen*, the *Tigart* Court concluded that the insurer was liable for the conduct of its attorney because of the insurer's complete control over the litigation.

¶30 In Palmer By Diacon v. Farmers Ins. (1993), 261 Mont. 91, 861 P.2d 895, the insured brought suit against the insurer, arguing that the insurer's denial of his claim for uninsured motorist benefits was made in bad faith. The insured claimed that an unidentified truck ran his motorcycle off a road. When the insurer denied his claim based on the statement of a witness that the truck was in its own lane, the insured filed suit. The district court ordered

the insurer to produce all claim file materials dated before the time when the insured indicated that he would bring a bad faith action against the insured. Those materials "included confidential reports sent to [the insurer] by the attorneys who represented it in the uninsured motorist case." *Palmer*, 261 Mont. at 100, 861 P.2d at 900. Subsequently, the district court ruled for the insured. On appeal, the insurer raised the issue whether the attorney-client privilege applied in "first-party bad faith cases in which the insurer's attorney did not represent the insured's interests in the underlying case." *Palmer*, 261 Mont. at 107, 861 P.2d at 905.

¶31 Defining first-party bad faith actions as cases where the plaintiff is the insured, the *Palmer* Court distinguished two kinds of first-party bad faith cases. The Court determined that one kind "involves dual representation by the attorney." *Palmer*, 261 Mont. at 108, 861 P.2d at 905. Such cases often arise when "a third-party claimant obtains a judgment in excess of policy limits and the insured later sues the insurance company for failure to settle within policy limits." *Palmer*, 261 Mont. at 108, 861 P.2d at 905. Quoting *Jessen*, the *Palmer* Court determined that in such first-party bad faith cases, "[u]nder an insurance contract . . . the insurer initially employs the attorney to represent the interests of *both* the insured and the insurer." *Palmer*, 261 Mont. at 108, 861 P.2d at 905. The *Palmer* Court recognized that other courts have held that under that kind of first-party bad faith action, "the insured is entitled to the entire claim file prepared for the underlying lawsuit, because the insurer created the file primarily on behal of the insured." *Palmer*, 261 Mont. at 108, 861 P.2d at 905 (citation omitted).

¶32 However, under the facts in *Palmer*, the Court concluded that the action was a distinct kind of first-party bad faith action and that when the insurer denied the insured his uninsured motorist coverage, the insurer stepped into the shoes of the unidentified third-party motorist. *Palmer*, 261 Mont. at 108, 861 P.2d at 905-06. The *Palmer* Court further concluded that "[t]he attorneys who represented [the insurer] in the uninsured motorist case have not represented [the insured], therefore the dual representation reasoning does not apply in this case." *Palmer*, 261 Mont. at 108, 861 P.2d at 906. Like the Court in *Second Judicial Dist. Court*, the *Palmer* Court recognized the dual representation doctrine only in determining whether the communications between an insurer and its attorneys are subject to the attorney-client privilege.

¶33 As the foregoing decisions demonstrate, we have followed *Jessen* in holding insurers responsible for the conduct of defense counsel and we have applied the attorney-client privilege to communications between insurers and defense counsel in cases where by

contract the insurer was deemed to have assumed absolute control of the litigation. None of these decisions addressed whether insurers and insureds are co-clients under the Rules of Professional Conduct, and none of them addressed whether defense counsels' compliance with insurance contracts that repose "absolute" control of litigation in insurer violated the Rules of Professional Conduct.

¶34 We note that Respondents argue that insurance contracts effectively place absolute control of litigation with insurers. However, Respondents' claim of absolute control of litigation cannot be reconciled with their insistence that whenever a conflict may arise between their litigation guidelines and an attorney's ethical obligations, the attorney is to follow the ethical course of action. Respondents' assertion that defense counsel are not only free to but must follow their independent judgment is inconsistent with their claim that insurers have absolute control of litigation.

*B. Whether insurers and insureds are co-clients under Montana's Rules of Professional Conduct.*

¶35 We turn to the question whether an insurer is a client of defense counsel under the Rules of Professional Conduct. We note that some other courts have concluded that the insurer is not a client of defense counsel. In Atlanta Int. Ins. Co. v. Bell (Mich. 1991), 475 N.W.2d 294, the court addressed whether defense counsel retained by an insurer to defend its insured may be sued by the insurer for professional malpractice. Recognizing the general rule that an attorney will only be held liable for negligence to his client, the court determined that "the relationship between the insurer and the retained defense counsel [is] less than a client-attorney relationship." *Bell*, 475 N.W.2d at 297. The court further determined, however, that although the insurer is not a client of defense counsel, the defense counsel nevertheless "occupies a fiduciary relationship to the insured, as well as to the insurance company." *Bell*, 475 N.W.2d at 297. Recognizing further that "the tripartite relationship between insured, insurer, and defense counsel contains rife possibility [sic] of conflict," *Bell*, 475 N.W.2d at 297, the court reasoned that "[t]o hold that an attorney-client relationship exists between insurer and defense counsel could indeed work mischief, yet to hold that a mere commercial relationship exists would work obfuscation and injustice." *Bell*, 475 N.W.2d at 297.

¶36 Nor is Michigan unique in concluding that the insured is the sole client of defense counsel. *See* Jackson v. Trapier (Sup. Ct. 1964), 247 N.Y.S.2d 315, 316 (concluding that once defense undertaken, "defendant is the client and not the insurance carrier even

though the latter may have chosen the counsel and may be paying his fee"); Continental Cas. v. Pullman, Comley, et al. (2nd Cir. 1991), 929 F.2d 103, 108 (citation omitted) (concluding "[i]t is clear beyond cavil that in the insurance context the attorney owes his allegiance, not to the insurance company that retained him but to the insured defendant"); Point Pleasant Canoe Rental v. Tinicum Tp. (E.D. Pa. 1986), 110 F.R.D. 166, 170 (concluding "[w]hen a liability insurer retains a lawyer to defend an insured, the insured is considered the lawyer's client"); First American Carriers v. Kroger Co. (Ark. 1990), 787 S. W.2d 669, 671 (citation omitted) (concluding that " 'when a liability insurer retains a lawyer to defend an insured, the insured is the lawyer's client'").

¶37 Respondents argue vigorously that the interests of an insurer and an insured usually coincide and that most litigation is settled within an insured's coverage limits. These arguments gloss over the stark reality that the relationship between an insurer and insured is permeated with potential conflicts. *Compare* Thomas D. Morgan, *What Insurance Scholars Should Know About Professional Responsibility*, 4 Conn.Ins.L.J. 1, 7-8, 1997 (concluding that designating insurer "a second client . . . would routinely create the potential for conflicts of interest"); Kent D. Syverud, *What Professional Responsibility Scholars Should Know About Insurance*, 4 Conn.Ins.L.J. 17, 23-24, 1997 (recognizing "[b]oth insurance companies and insureds have important and meaningful stakes in the outcome [of] a lawsuit against the insureds, stakes that include not just the money that the insurance company must pay in defense and settlement, but also the uninsured liabilities of the insured, which include not just any judgment in excess of liability limits, but also the insured's reputation and other non-economic stakes. The history of liability insurance suggests that unbridled control of the defense of litigation by either the insurance company or the insured creates incentives for the party exercising that control to take advantage of the other"). *Compare also* Restatement (Third) of the Law Governing Lawyers § 215, Comment f(5) (Proposed Final Draft No. 2, 1998) (emphasis added) (recognizing "[m]aterial divergence[s] of interest might exist between a liability insurer and an insured . . . . Such occasions for conflict may exist at the outset of the representation *or may be created by events that occur thereafter*"). In cases where an insured's exposure exceeds his insurance coverage, where the insurer provides a defense subject to a reservation of rights, and where an insurer's obligation to indemnify its insured may be excused because of a policy defense, there are potential conflicts of interest.

¶38 We reject Respondents' implicit premise that the Rules of Professional Conduct need not apply when the interests of insurers and insureds coincide. The Rules of Professional Conduct have application in all cases involving attorneys and clients. Moreover, whether

the interests of insurers and insureds coincide can best be determined with the perfect clarity of hindsight. Before the final resolution of any claim against an insured, there clearly exists the potential for conflicts of interest to arise. Further, we reject the suggestion that the contractual relationship between insurer and insured supersedes or waives defense counsels' obligations under the Rules of Professional Conduct. We decline to recognize a vast exception to the Rules of Professional Conduct that would sanction relationships colored with the appearance of impropriety in order to accommodate the asserted economic exigencies of the insurance market. *Compare Kroger*, 787 S.W.2d at 671 (concluding "[w]e have consistently taken strong positions in situations where the public's confidence in attorneys might be eroded by the appearance of a conflict of interest"). We hold that under the Rules of Professional Conduct, the insured is the *sole* client of defense counsel.

¶39 We caution, however, that this holding should not be construed to mean that defense counsel have a "blank check" to escalate litigation costs nor that defense counsel need not ever consult with insurers. Under Rule 1.5, M.R.Prof.Conduct, for example, an attorney must charge reasonable fees. *See* Rule 1.5, M.R.Prof.Conduct (providing in part that "[a] lawyer's fees shall be reasonable"). Nor, finally, should our holding be taken to signal that defense counsel cannot be held accountable for their work.

¶40 Respondents argue further, however, that even if an insurer is not a co-client of defense counsel, an insurer's control of litigation is necessary and appropriate. Respondents argue that the insurer must control the litigation in order to meet its duties to the insured to indemnify and to provide a defense. Further, Respondents argue that the insured has a good faith duty to cooperate with the insurer in defense of a claim that warrants an insurer's control of litigation, and that in any event insureds agree to insurers' control of litigation. Respondents also argue that insureds typically contract for a limited defense that does not protect their reputational interests and that they are not entitled to unlimited expenditures on their behalf. Further, Respondents assert that insurers and insureds have "aligned" interests in minimizing litigation costs and settlements.

¶41 None of these arguments is persuasive. Animating them is the deeply flawed premise that by contract insurers and insureds may dispense with the Rules of Professional Conduct.

¶42 Respondents also argue that insurers' control of litigation is justified under the Restatement and that, for example, under the proposed draft for § 215 of the Restatement

(Third) of the Law Governing Lawyers, an insurer's direction of a defense is justified regardless whether the insurer is a co-client "when the insurer 'will pay any judgment rendered against the [insured] client and [the insurer] makes a decision that defense costs beyond those designated by [the insurer] would not significantly change the likely outcome.' " We decline to join the parties' arguments over the Restatement. We note that in the draft cited by Respondents, the Restatement states that it "has not been considered by the members of the American Law Institute and does not represent the position of the Institute on any of the issues with which it deals. Restatement (Third) of the Law Governing Lawyers (Proposed Final Draft No. 2, 1998). More importantly, we are in no way bound by the Restatement in interpreting Montana's Rules of Professional Conduct.

¶43 Respondents also suggest that the billing and practice rules' requirement of prior approval is not as strict as it appears, that insurers employ it to ensure that they are consulted, and that they "rarely" withhold approval. They contend that preapproval is permissible because the insurer "is entitled not to pay for services that are overpriced or unnecessary to the case."

¶44 We conclude that whether the requirement of prior approval seldom results in denials of authorization for defense counsel to perform legal services begs the question whether the requirement of prior approval violates the Rules of Professional Conduct. Without reaching the issue here, moreover, we caution further that a mere *requirement* of consultation may be indistinguishable, in its interference with a defense counsel's exercise of independent judgment and ability to provide competent representation, from a requirement of prior approval. Further, the entitlement of insurers not to pay for overpriced or unnecessary services, which Petitioners do not dispute, also begs the question whether the requirement of prior approval violates the Rules of Professional Conduct.

¶45 Finally, Respondents argue that their billing and practice rules do not interfere with defense counsels' freedom of action. As previously discussed, they suggest that when an insurer denies approval for particular actions that defense counsel propose, nothing prevents defense counsel from exercising their independent judgment and doing the very thing for which the insurer has denied approval. We reject Respondents' underlying dubious premise that the threat of withholding payment does not interfere with the independent judgment of defense counsel. The very action taken by Petitioners in seeking declaratory relief in the present case is a blunt repudiation of that speculative premise. Further, if the threat of withholding payment were quite as toothless as Respondents

suggest, we doubt that they would make such a threat, let alone that they would expressly incorporate it in their billing and practice rules.

*C. Whether the requirement of prior approval violates the Rules of Professional Conduct.*

¶46 Having concluded that the insured is the sole client of defense counsel, we turn to the fundamental issue whether the requirement of prior approval in billing and practice rules conflicts with defense counsels' duties under the Rules of Professional Conduct. The parties appear to agree that defense counsel may not abide by agreements limiting the scope of representation that interfere with their duties under the Rules of Professional Conduct. *Compare* Annotated Model Rules of Professional Conduct (Fourth ed. Center for Professional Responsibility American Bar Association) Rule 1.2, p. 12, Comment [4] (concluding "[t]he objectives or scope of services provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client. . . . [5] An agreement concerning the scope of representation must accord with the Rules of Professional Conduct and other law. Thus, the client may not be asked to agree to representation so limited in scope as to violate Rule 1.1").

¶47 We conclude that the requirement of prior approval fundamentally interferes with defense counsels' exercise of their *independent* judgment, as required by Rule 1.8(f), M.R. Prof.Conduct. Further, prior approval creates a substantial appearance of impropriety in its suggestion that it is insurers rather than defense counsel who control the day to day details of a defense.

¶48 Montana is not alone in rejecting arrangements that fetter lawyers' undivided duty of loyalty to their clients and their independence of professional judgment in representing their clients. In Petition of Youngblood (Tenn. 1995), 895 S.W.2d 322, the court determined that for inhouse attorney employees of an insurance company to represent insureds was not a *per se* ethical violation. However, the *Youngblood* court emphasized the loyalty that an attorney owes an insured and concluded that

> Some of the usual characteristics incident to [the employer-employee] relationship cannot exist between the insurer and the attorney representing an insured. The employer cannot control the details of the attorney's performance, dictate the strategy or tactics employed, or limit the attorney's professional discretion with regard to the representation. Any policy, arrangement or device which effectively limits, by design or operation, the attorney's professional judgment on behalf of or

loyalty to the client is prohibited by the Code, and, undoubtedly, would not be consistent with public policy.

*Youngblood, 895 S.W.2d at 328. The court went to conclude that "[t]he same loyalty is owed the client whether the attorney is employed and paid by the client, is a salaried employee of the insurer, or is an independent contractor engaged by the insurer." Youngblood, 895 S.W.2d at 328.*

¶49 In addressing whether an insurer is vicariously liable for the malpractice of defense counsel, the Texas Supreme Court was similarly critical of insurer directions to defense counsel that interfere with their independent judgment and undivided loyalty to insureds. *See* State Farm Mut. Auto. Ins. Co. v. Traver (Tex. 1998), 980 S.W.2d 625. In *Traver*, the court held that an insurer is not vicariously liable for the malpractice of an independent attorney whom it chooses to defend an insured. The court in *Traver* reasoned that in evaluating whether a principal is vicariously responsible for the actions of its agent, "the key question is whether the principal has the right to control the agent with respect to the details of that conduct." *Traver*, 980 S.W.2d at 627 (citation omitted). The court determined that "even assuming that the insurer possesses a level of control comparable to that of a client, this does not meet the requisite for vicarious liability." *Traver*, 980 S.W.2d at 627. The *Traver* court went on to conclude:

> A defense attorney, as an independent contractor, has discretion regarding the day-to-day details of conducting the defense, and is not subject to the client's control regarding those details. While the attorney may not act contrary to the client's wishes, the attorney "is in complete charge of the minutiae of court proceedings and can properly withdraw from the case, subject to the control of the court, if he is not permitted to act as he thinks best." Moreover, because the lawyer owes unqualified loyalty to the insured, *the lawyer must at all times protect the interests of the insured if those interests would be compromised by the insurer's instructions*.

*Traver, 980 S.W.2d at 627-28 (citations omitted) (emphasis added). In a concurring and dissenting opinion, Justice Gonzalez criticized the court for a "perhaps naive view of the current status of insurance defense practice." Traver, 980 S.W.2d at 632 (J. Gonzalez, concurring and dissenting). Justice Gonzalez cautioned that*

> measures designed to produce a no-frills defense can easily result in only a token defense. I am concerned that defense lawyers may be reluctant to resist cost-cutting measures that detrimentally affect the quality of the insured's defense. There is a real risk that these efforts at cost containment compromise a lawyer's autonomy and

independent judgment on the best means for defending an insured. . . . The lawyers are under tremendous pressure trying to serve two masters.

*Traver, 980 S.W.2d at 634 (J. Gonzalez, concurring and dissenting).*

¶50 Moreover, in American Ins. Ass'n v. Kentucky Bar Ass'n (Ky. 1996), 917 S.W.2d 568, the court affirmed an Advisory ethics opinion that proscribed insurers' use of inhouse attorneys to represent insureds. The court in *Kentucky Bar Ass'n* also affirmed an Advisory ethics opinion concluding that a lawyer may not "enter into a contract with a liability insurer in which the lawyer or his firm agrees to do all of the insurer's defense work for a set fee." *Kentucky Bar Ass'n*, 917 S.W.2d at 569. The court concluded that

> the pressures exerted by the insurer through the set fee interferes [sic] with the exercise of the attorney's independent professional judgment, in contravention of Rule 1.8(f)(2). The set fee arrangement also clashes with Rule 1.7(b) in that it creates a situation whereby the attorney has an interest in the outcome of the action which conflicts with the duties owed to the client: quite simply, in easy cases, counsel will take a financial windfall; in difficult cases, counsel will take a financial loss.

*Kentucky Bar Ass'n, 917 S.W.2d at 572. The Kentucky Bar Ass'n court stressed that "the mere appearance of impropriety is just as egregious as any actual or real conflict. Therefore, [the Advisory opinion] acts as a prophylactic device to eliminate the potential for a conflict of interest or the compromise of an attorney's ethical and professional duties." Kentucky Bar Ass'n, 917 S.W.2d at 573 (emphasis added). Recognizing that set fee arrangements are "ripe with potential conflicts," the court concluded that the insurer and insured are "subject to complete divergence at any time. Inherent in all of these potential conflicts is the fear that the entity paying the attorney, the insurer, and not the one to whom the attorney is obligated to defend, the insured, is controlling the legal representation." Kentucky Bar Ass'n, 917 S.W.2d at 573 (emphasis added).*

¶51 We hold that defense counsel in Montana who submit to the requirement of prior approval violate their duties under the Rules of Professional Conduct to exercise their independent judgment and to give their undivided loyalty to insureds. *Compare* Rule 1.7 (b) (providing "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibility to another client or to a third person"); Annotated Model Rules of Professional Conduct, Comment [4] to Rule 1.7 (concluding "[t]he critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional

judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client"); State v. Jones (1996), 278 Mont. 121, 125, 923 P.2d 560, 563 (concluding "[t]he duty of loyalty is 'perhaps the most basic of counsel's duties' ") (citation omitted).

¶52 2. May an attorney licensed to practice law in Montana, or admitted pro hac vice, be required to submit detailed descriptions of professional services to outside persons or entities without first obtaining the informed consent of his or her client and do so without violating client confidentiality?

¶53 Rule 1.6 provides in pertinent part:

### Confidentiality of Information

(a)  A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation.

Rule 1.6(a), M.R.Prof.Conduct.

¶54 As a representative set of guidelines concerning the disclosure of detailed descriptions of professional services to third-party auditors, we consider the guidelines submitted by the Zurich-American Insurance Group (hereafter, Zurich). Zurich's litigation guidelines regarding audits provide in pertinent part:

### Audits

Zurich-American reserves the right to examine and audit books, records, other documents, and supporting material for the purpose of evaluating compliance with its litigation management guidelines, the billing requirements set forth therein, and the reasonableness of the firm's charges. The books, records, and documents we may examine include, without limitation: original time sheets from attorneys and staff; explanations of billing methods and practices; attorney work product and other contents of open and closed files involving the defense of Zurich-American customers; phone message records; and diaries, etc.

All requested books and records must be made available to us during business hours

for examination, audit, or reproduction. We shall employ, at our discretion, internal auditors or independent outside auditors for purposes of accomplishing audits.

¶55 Petitioners argue that Respondents' billing and practice rules require the disclosure of confidential detailed descriptions of professional services. These disclosures are not impliedly authorized and do not further representation. Nor does an insured's contractual consent to disclosure of confidential information cure such disclosures, as an insured cannot know in advance of litigation what will be disclosed. Petitioners argue further that third-party auditors are different from insurers and that they do not fall within a protective "magic circle." Petitioners argue that under the Rules of Professional Conduct, disclosures of detailed billing statements to third-party auditors are only permissible if the client gives his informed consent after consultation.

¶56 Respondents respond that third-party auditors are agents of insurers. Because they share "common interests" with insureds in reducing costs of litigation, third-party auditors are part of a privileged community. Further, insureds' consent is implied for disclosures that are reasonably necessary for representation. Thus, disclosures to third-party auditors are like disclosures to secretaries and computer technicians. Moreover, insureds have consented to disclosure by contract. Respondents also argue that whether a disclosure to a third-party auditor breaches the attorney-client privilege is a question of fact. Further, Respondents argue that much of the information in billing statements is neither confidential nor privileged. Finally, Respondents contend that the obligation of defense attorneys to charge reasonable fees is meaningless if insurers cannot monitor their services.

¶57 Underlying the parties' positions is a fundamental disagreement regarding whether third-party auditors are part of a privileged community or magic circle within which confidential information may be shared without waiver of attorney-client or work product privilege. Respondents argue that in United States v. Mass. Inst. of Technology (1st Cir. 1997), 129 F.3d 681, the court recognized insurer and insured as a relationship within which parties share a common interest that protects privileged communications. Respondents argue further that in Indian Law Resource Ctr. v. Dept. of Interior (D. D.C. 1979), 477 F.Supp. 144, the court concluded that an auditor was a confidential agent of a privileged party and that disclosure of attorney fee information did not waive any privilege.

¶58 *Mass. Inst. of Technology* does not support Respondents' claims. In *Mass. Inst. of Technology*, the IRS requested the billing statements of law firms that had represented MIT. MIT had apparently disclosed the very same billing statements to the Defense

Contract Audit Agency (the audit agency), which "help[ed] entities in the Department of Defense review contract performance to be sure that the government [was] not overcharged for services." *Mass. Inst. of Technology*, 129 F.3d at 683. MIT gave IRS the documents it requested but redacted information that it claimed was covered by the attorney-client privilege, the work product doctrine, or both. In turn, the audit agency refused to give the IRS those documents without the consent of MIT. The IRS also requested minutes of the MIT corporation and its executive and auditing committees. The district court ruled that MIT's disclosure of legal bills to the audit agency forfeited its attorney-client privilege. However, concluding that three of the minutes contained privileged material that MIT had not been shown to have disclosed to the audit agency the district court declined to order their production.

¶59 On appeal, MIT argued that its disclosure of the billing statements to the audit agency did not forfeit its attorney-client privilege. Further, while conceding that it could not prove that it had withheld the three minutes from the audit agency, MIT argued that the minutes were protected by the attorney-client privilege and the work product doctrine. On cross-appeal, the IRS argued that the district court erred in concluding that the three minutes contained privileged material.

¶60 The court in *Mass. Inst. of Technology* concluded that "decisions do tend to mark out, although not with perfect consistency, a small circle of 'others' with whom information may be shared without loss of the privilege (*e.g.*, secretaries, interpreters, counsel for a cooperating co-defendant, a parent present when a child consults a lawyer)." *Mass. Inst. of Technology*, 129 F.3d at 684. The court emphasized that "the underlying concern is functional: that the lawyer be able to consult with others needed in the representation and that the client be allowed to bring closely related persons who are appropriate, even if not vital, to a consultation." *Mass. Inst. of Technology*, 129 F.3d at 684 (citation omitted). The court acknowledged that "[i]n a rather abstract sense, MIT and the audit agency do have a 'common interest' in the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills." *Mass. Inst. of Technology*, 129 F.3d at 686. However, the court determined that

> this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients-who are working together in prosecuting or defending a lawsuit or in certain other legal transactions-can exchange information among themselves without loss of the privilege. To extend the notion to MIT's relationship with the audit agency, which on another level is easily characterized as adversarial,

would be to dissolve the boundary almost entirely.

*Mass. Inst. of Technology, 129 F.3d at 686.*

¶61 Turning to MIT's disclosure of its minutes to the audit agency, the court concluded that its treatment of the billing statements disposed of MIT's claim that its attorney-client privilege survived disclosure of the minutes to the audit agency, and the court focused on MIT's work product claim. The court concluded that the prevailing rule is that "disclosure to an adversary, real or potential, forfeits work product protection." *Mass. Inst. of Technology*, 129 F.3d at 687. The court went on to conclude that

> MIT's disclosure to the audit agency was a disclosure to a potential adversary. The disclosures did not take place in the context of a joint litigation where the parties shared a common legal interest. The audit agency was reviewing MIT's expense submissions. MIT doubtless hoped that there would be no actual controversy between it and the Department of Defense, *but the potential for dispute and even litigation was certainly there.*

*Mass. Inst. of Technology, 129 F.3d at 687 (emphasis added).*

¶62 In the present case we note Respondents' claim that the court in *Mass Inst. of Technology* recognized insurers and insureds as a relationship within which parties share a common interest that protects their privileged communications. Their claim is misguided. First, in *Mass Inst. of Technology*, MIT argued that its disclosure to the audit agency was like other cases where "disclosure has been allowed, without forfeiting the privilege, among separate parties similarly aligned in a case or consultation (*e.g.*, codefendants, insurer and insured, patentee and licensee)." *Mass. Inst. of Technology*, 129 F.3d at 685. In other words it was MIT, not the court, who made the analogy to the insurer-insured relationship. Second, in a footnote, the court in *Mass. Inst. of Technology* cited several decisions that have considered insurer-insured relationships.

¶63 In the first of these decisions, Roberts v. Carrier Corp. (N.D. Ind. 1985), 107 F.R.D. 678, the court addressed whether the company, Carrier, in passing on arguably privileged communications between itself and its attorney and between its attorney and its insurer to another company, Hamilton, waived any privilege that might otherwise have attached to those communications. The court recognized that under Indiana law, a statement by a "client to his attorney for communication to a third person is not considered confidential." *Carrier*, 107 F.R.D. at 686 (citations omitted). However, the court found that Carrier and

Hamilton were sister subsidiaries of United Technologies and concluded that when "a corporation with a legal interest in an attorney-client communication relays it to another related corporation, the attorney-client privilege is not thereby waived." *Carrier*, 107 F.R. D. at 687 (citation omitted). Further, the court found that "Carrier and Hamilton do share an identical legal interest: defense of a claim based upon a malfunction of valve #242." *Carrier*, 107 F.R.D. at 688. Under those particular facts, the court concluded that Indiana's rule concerning communications to third parties was not violated. *Carrier*, 107 F.R.D. at 688.

¶64 In the second of these decisions, Linde Thomson Langworthy Kohn & Van Dyke v. RTC (D.C. Cir. 1993), 5 F.3d 1508, the court noted that "[f]ederal courts have never recognized an insured-insurer privilege as such." *Linde Thomson*, 5 F.3d at 1514 (citations omitted). The court went on to

> firmly reject any sweeping notion that there is an attorney-client privilege in insured-insurer communications. . . . Certainly, where the insured communicates with the insurer for the express purpose of seeking legal advice with respect to a concrete claim, or for the purpose of aiding an insurer-provided attorney in preparing a specific legal case, the law would exalt form over substance if it were to deny application of the attorney-client privilege. However, a statement betraying neither interest in, nor pursuit of, legal counsel bears only the most attenuated nexus to the attorney-client relationship. . . . *[I]f what is sought is not legal advice, but insurance, no privilege can or should exist.*

*Linde Thomson, 5 F.3d at 1515 (citations omitted) (emphasis added).*

¶65 *Carrier* and *Linde Thomson* clearly do not support Respondents in the present case. Respondents have not suggested that third-party legal auditors "share an identical *legal* interest" with insureds. *Carrier*, 107 F.R.D. at 688 (emphasis added). Nor have Respondents suggested that "what is sought [from third-party auditors] is . . . legal advice." *Linde Thomson*, 5 F.3d at 1515. Moreover, *Carrier* and *Linde Thomson* do not address the disclosure of confidential information to third-party auditors under Montana's Rules of Professional Conduct.

¶66 Respondents rely on the court's decision in *Indian Law Resource Center* to argue that third-party auditors are confidential agents of insureds and that disclosure of billing statements to them therefore does not waive any privilege. We conclude that their reliance

on *Indian Law Resource Center* is also misplaced. In *Indian Law Resource Center*, the plaintiff, a nonprofit corporation, brought an action under the Freedom of Information Act (FOIA), seeking disclosure of documentation regarding payments from funds under federal control to attorneys who served the Hopi tribe. The plaintiff requested documents that included "(1) Tribal resolutions reflecting the names of the lawyers chosen and the fee amounts endorsed; (2) periodic law firm statements to the Tribal Council, with attached vouchers describing in detail legal services provided and travel expenses incurred." *Indian Law Resource Center*, 477 F.Supp. at 146. Plaintiff's request was first sent to the Bureau of Indian Affairs (BIA); the Department of Interior (Interior) denied that request. The court in *Indian Law Resource Center* noted that "[a]s part of its general trust responsibility to the Indians, Interior reviews and approves the choice of counsel and fixing of fees by Indian tribes." *Indian Law Resource Center*, 477 F.Supp. at 145.

¶67 The "only issue" in *Indian Law Resource Center* was whether, under an exemption in FOIA, the "withheld information is either confidential or privileged." *Indian Law Resource Center*, 477 F.Supp. at 146. Interior argued that the information withheld should be deemed confidential under FOIA because the information was received pursuant to "the agency's fulfillment of its trust responsibilities." *Indian Law Resource Center*, 477 F.Supp. at 146. Interior argued further that as a trustee it should "not be required to divulge whatever material The Hopi Tribe as beneficiary declares to be confidential, so long as the material otherwise qualifies under [FOIA] exemption four." *Indian Law Resource Center*, 477 F.Supp. at 147.

¶68 The court concluded that there was substantial evidence of future harm from disclosure of the detailed law firm statements and that the law firm statements were entitled to protection as attorney work product. Finding no evidence that the vouchers had been disclosed to any party other than Interior, "which is acting as a confidential agent of the Tribe," *Indian Law Resource Center*, 477 F.Supp. at 148, the court concluded that the law firm statements are "exempt from disclosure under [FOIA] exemption four, on grounds of both privilege and confidentiality." *Indian Law Resource Center*, 477 F.Supp. at 149.

¶69 In the present case, Respondents compare Interior to third-party auditors and argue that because third-party auditors act as confidential agents, disclosure of billing information to them does not waive "the privilege." Respondents' reading of *Indian Law Resource Center* is incorrect. Third-party auditors are not confidential agents of insureds but function rather as agents of insurers. Moreover, to compare third-party auditors to

Interior, the confidential agent in *Indian Law Resource Center*, is to ignore the specific trust responsibilities that Interior has for the Hopi tribe, trust responsibilities that Respondents do not claim that third-party auditors similarly bear for insureds. Further, *Indian Law Resource Center* is readily distinguishable from the present case as the court there addressed a specific exemption under FOIA but did not address Rule 1.6 of the Rules of Professional Conduct.

¶70 We conclude that a third-party auditor is not within the "magic circle" or community of interest that the court in *Mass. Inst. of Technology* recognized. Respondents, again, claim that the purpose of third-party auditors complements the interests of insureds and that third-party auditors merely seek to control the costs of defense in order to keep insurance premiums down for insureds. This asserted common interest in keeping litigation costs and premiums down is not sufficient to bring third-party auditors within the magic circle. The Rules of Professional Conduct do not vary according to commercial exigencies. Nor are third-party auditors "confidential agent[s]" of insureds. *Indian Law Resource Center*, 477 F.Supp. at 148. We further conclude that disclosure of detailed billing statements to a third-party auditor is "disclosure to a potential adversary." *Mass. Inst. of Technology*, 129 F.3d at 687. In third-party auditors' review of confidential information, there is always the possibility of disputes between auditors, defense counsel and their clients that could result in litigation.

¶71 Nor are third-party auditors "needed in the representation" or "appropriate, even if not vital, to a consultation," as secretaries and computer technicians may well be. *Mass. Inst. of Technology*, 129 F.3d at 684. Disclosure to persons needed in the representation or appropriate to a consultation does not also justify disclosure "to a potential adversary." *Mass. Inst. of Technology*, 129 F.3d at 687.

¶72 We note Respondents argue that because the attorney-client privilege extends to the insurer and because an insurer can only act through its employees and agents, the attorney-client privilege applies to an insurer's agents as well, citing United States v. Schwimmer (2nd Cir. 1989), 892 F.2d 237. In *Schwimmer*, the court recognized that the attorney-client privilege "is held to cover communications made to certain agents of an attorney," *Schwimmer*, 892 F.2d at 243, and the court also recognized the "common interest" rule as protecting "the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer*, 892 F.2d at 243 (citation omitted). *Schwimmer* does not support Respondents' argument. Third-party

auditors are not agents of defense counsel, nor are disclosures to them "communications passing from one party to the attorney for another party." *Schwimmer*, 892 F.2d at 243.

¶73 In determining that third-party auditors fall outside the "magic circle," however, we do not hold that the disclosure of detailed descriptions of professional services to a third-party auditor necessarily violates any privilege that may attach to them. Resolution of that issue would clearly entail findings of fact that we have not made in the present case.

¶74 Having determined that insurers are not clients of defense counsel and that third-party auditors are potential adversaries of defense counsel, we turn to the issue whether the disclosure of billing statements to third-party auditors is "impliedly authorized in order to carry out the representation." Rule 1.6., M.R.Prof.Conduct.

¶75 Petitioners do not dispute that disclosures of billing information to *insurers* are impliedly authorized to carry out representation. It does not follow, however, that disclosing billing information to third-party auditors is also impliedly authorized. As previously discussed, third-party auditors lie outside the "magic circle" and do not share a community of interest with insureds. Their mission, as characterized in part by Respondents, is to find fault with legal charges, not to further the representation of insureds. Further, unlike secretaries and computer technicians who are engaged to assist defense counsel, third-party auditors are not employed by defense counsel and as noted they are potential adversaries of defense counsel. As such, third-party auditors stand in potential conflict with the interests of insureds in competent representation by defense counsel who exercise their independent professional judgment.

¶76 Further, we reject Respondents' argument that insureds' consent by contract to disclosure of detailed professional billing statements comports with Rule 1.6, M.R.Prof. Conduct. An insured executing a liability policy with an insurer cannot know at the time he enters the contract what kind of claim will be brought against him, what the issues will be, or what kinds of services will be undertaken by his defense attorney. Nor can an insured know, at the time he contracts for insurance, the legal consequences that may result from the disclosure of billing information to a third-party auditor. Depending on the facts and circumstances, such disclosure may waive a specific privilege. Thus, under Rule 1.6, M.R.Prof.Conduct, for an insured to make a fully informed consent to disclosure of detailed professional billing statements, the consent must be contemporaneous with the facts and circumstances of which the insured should be aware.

¶77 We emphasize that by its plain language, Rule 1.6, M.R.Prof.Conduct, extends to *all* communications between insureds and defense counsel and that this rule is therefore broader in both scope and protection than the attorney-client privilege and the work product doctrine. *Compare* In re Advisory Opinion No. 544 of N.J. (N.J. 1986), 511 A.2d 609, 612 (citation omitted) (emphasis added) (concluding "this Rule [of Confidentiality] expands the scope of protected information to include *all* information relating to the representation, regardless of the source or whether the client has requested it be kept confidential or whether the disclosure of the information would be embarrassing or detrimental to the client"); Damron v. Herzog (9th Cir. 1995), 67 F.3d 211, 215 (citation omitted) (concluding "[a]n integral purpose of the rule of confidentiality is to encourage clients to fully and freely disclose to their attorneys all facts pertinent to their cause with absolute assurance that such information will not be used to their disadvantage").

¶78 We hold that disclosure by defense counsel of detailed descriptions of professional services to third-party auditors without first obtaining the contemporaneous fully informed consent of insureds violates client confidentiality under the Rules of Professional Conduct.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

1. As previously noted, the insured also paid a fee to the attorney whom the insurer hired.