AMERICAN EMPLOYERS INSURANCE COMPANY, Plaintiff, *v.* GOBLE AIRCRAFT SPECIALTIES, INC., et al., Defendants.

Supreme Court, Special Term, New York County, June 9, 1954.

*Walter K. Connor* for plaintiff.

*John W. Trapp* for Goble Aircraft Specialties, Inc., and others, defendants.

*Louis E. Schwartz* for Mary Finkelberg, as administratrix of the estate of Victor Finkelberg, deceased, and another, defendants.

*Francis E. Carberry* for Margaret O'Brien, as administratrix of the estate of Patrick O'Brien, deceased, defendant.

*Morris Zweibel* for Eugene Laurenzana, as executor of Frank Laurenzana, deceased, and another, defendants.

FRANK, J. This is an action for a declaratory judgment.

On September 1, 1951, a fishing boat named " Pelican " sailed from a slip, forming a part of a development known as Fishangri-La, located in an inlet called Ford Pond Bay, at Montauk, Long Island. While more than a half-mile north of the lighthouse at Montauk Point and some miles from Fort Pond Bay, the vessel encountered high winds, heavy seas and a rip tide. It capsized and foundered with a resultant loss of forty-six lives. Edward Carroll, owner and captain of the " Pelican ", was among those who died.

The dock was part of a business establishment that included a dockmaster's office, a bait and tackle shop, a garage, a gas station, two restaurants, a bar, a cocktail lounge, and a lodge and cottages with sleeping accommodations. The entire development was owned by defendant Goble Aircraft Specialties, Inc., and leased to defendant Fishangri-La, Inc. The defendant Gene W. Goble was president of both corporations.

The plaintiff insurance company issued a general liability policy (comprehensive form) dated April 5, 1951, containing a limit of its liability to $100,000 for each person and $300,000 for each accident, and purporting to indemnify the afore-mentioned corporations and Gene W. Goble, among other things (Coverage B) for " bodily injury * * * including death at any time resulting therefrom, sustained by any person and caused by accident ".

The remaining defendants, executors or administrators of the estates of some of the persons drowned when the " Pelican " foundered, instituted wrongful death actions against the assureds prior to the commencement of this action for a declaratory judgment. Eleven such actions in five different courts seek an aggregate recovery of $1,476,830.60. We are told that additional actions are now pending and it is readily apparent that the claims may total several millions of dollars.

The plaintiff seeks a declaration that (a) no liability attach to it under the terms of its policy with the assureds, and (b) it not be required to defend the actions against the assureds and, in any event, not beyond the policy coverage limits of $300,000. The defendants resist the plaintiff's contentions, assert that no justiciable controversy exists, and affirmatively seek a declaration that the policy coverage is $300,000 for each of the assureds. The problems raised as to the reservation of rights agreements, in our view, became academic by this determination and require no further discussion.

We hold that a justiciable controversy exists between plaintiff and its assureds for which there is no adequate remedy at law and for which a declaratory judgment is proper (*New York Cas. Co.* v. *Barbieri,* 196 Misc. 203).

The three principal defendants contend that each of them has coverage to the limit of $300,000 for a total of $900,000. We cannot so construe the policy. There is no proof that separate premiums were paid for each of them to obtain such coverage. The policy (Par. 7) provides: " The inclusion herein of more than one insured shall not operate to increase the limits of the company's liability."

Prefatorily, it should be noted that generally the decisions indicate that policies of insurance or indemnity are to be construed liberally in favor of the assureds and strictly against the carrier (*Lite* v. *Firemen's Ins. Co.,* 119 App. Div. 410, 412, affd. 193 N. Y. 639; *Tonkin* v. *California Ins. Co.,* 294 N. Y. 326, 329; *Gerka* v. *Fidelity & Cas. Co.,* 251 N. Y. 51, 55). The word " comprehensive " includes those damages which a person of ordinary business intelligence would reasonably and naturally regard as incidental to or flowing from the hazard insured against (*Tonkin* v. *California Ins. Co., supra,* 329).

The several complaints in the wrongful death actions allege in substance that the assureds were negligent in the ownership, operation, supervision, maintenance, management and control of the dock, piers, equipment and appurtenances; that the assureds advertised to the public that they controlled and operated a fleet of fishing boats, including one described as " Pelican II ", under competent and skillful captains; that special fishermen's trains direct to Fishangri-La were provided; that fishing vessels were supervised for the proper protection of passengers, including safety; that accurate weather reports were obtained and furnished to captains; and that Carroll, an independent contractor, operated the vessel under the directions of and pursuant to a contract with the defendants.

As heretofore indicated, plaintiff contends that under the terms of its policy it cannot be held to indemnify the assureds for any wrongful death resulting from the catastrophe. It relies upon " Exclusion b " in its policy, which reads: " This policy does not apply: * * * (b) under Coverages B and D, except with respect to operations performed by independent contractors, to watercraft while away from premises owned, rented, or controlled by the named insured, automobiles while away from such premises or the ways immediately adjoining, or aircraft, or the loading or unloading thereof."

To sustain its position, the plaintiff urges: (1) there was no relationship of independent contractor; (2) the claimed " overloading " is excluded from coverage under the phrase " loading or unloading thereof "; (3) the accident occurred " to watercraft while away from premises, owned, rented or controlled by the named insured ".

It is alleged in the wrongful death actions that Carroll was an independent contractor who operated his vessel under the direction of and pursuant to a contract with the assureds and that their negligent acts at the premises resulted in the loss. Whether the captain was an independent contractor cannot be determined here. It remains as a question of fact in the wrongful death actions (*Johnson* v. *R. T. K. Petroleum Co.,* 289 N. Y. 101; *Irwin* v. *Klein,* 271 N. Y. 477). If the findings in those actions establish the relationship and also impose liability upon the assureds, the plaintiff would be required to indemnify.

Fishangri-La, Inc., leased slips to boat owners, one of whom was Carroll, captain of the capsized vessel " Pelican ". The agreement provided, *inter alia,* for the payment of $150 dockage to Fishangri-La, Inc., for the 1951 season. In addition, Carroll was required to pay twenty-five cents for each passenger; to purchase only from Fishangri-La, Inc., all gasoline, oil and bait used on the vessel; to operate his ship exclusively from Fishangri-La; and to abide by certain regulations in the agreement to be administered by the dockmaster employed by the assured. Pursuant to these regulations, Carroll and other boat captains were required to have their vessels available for fishermen arriving by train, to return from fishing trips in time for passengers to board homeward bound trains, to refuse boat charters unless all train passengers were first accommodated and prior notification of the charter had been given to the dockmaster. One of the crucial provisions follows: " (22) When, in the opinion of the Dockmaster, or his representative, weather, wind or sea conditions are such that sailings would be unsafe, he will cancel all sailings of boats docked at Fishangri-La. This decision will be binding upon all Captains of bottom boats and charter boats. Such cancellation will prohibit sailings of these same boats from other docks as well."

It thus appears and it is found that Fishangri-La exercised or had the right to exercise control over boats using its docks, for the safety of its patrons. It had the right to prohibit the departure of the subject vessel if, in the opinion of the dockmaster, weather, wind, or sea conditions made sailing unsafe.

The complaints in the wrongful death actions also allege that, under the direction of the assureds, the "Pelican" was permitted to sail without warning to its passengers despite adverse weather conditions, and while grossly overloaded. It is argued by plaintiff that carrying a far greater number of passengers than was proper or permitted (i.e., overloading) would relieve it of its obligation to indemnify under (b) of the exclusions. This, because the phrase "or the loading or unloading thereof" exempts the carrier from its coverage of the conveyances insured.

We cannot interpret the quoted phrase to include the transportation of an excessive number of passengers. It is our view that the exclusionary phrase deals with accidents occurring during the process of loading or unloading at the dock. Nowhere is the word "overloading" used in the policy, nor does it expressly eliminate coverage, in the event that an excess number of passengers were permitted to board the vessel. If that were plaintiff's intention, it should have so stated in the contract which it prepared. A careful search of the decisions, both American and British, has failed to reveal any case which precisely interprets the word "overloading" in its relation to "loading and unloading". Reverting, therefore, to the rules of interpretation hereinbefore discussed, we must hold that if the loss was occasioned by the assureds' permitting the vessel to sail overloaded, the carrier would be required to indemnify.

Exclusion (b) eliminates coverage for hazards arising from the use of watercraft away from the premises. It does not take from such coverage accidents occurring on watercraft away from the premises, since the hazard and not the accident is excluded. The negligence alleged in the wrongful death action complaints includes failure properly to maintain and control the premises. The word "premises" encompasses watercraft berthed thereat. One of the wrongful acts charged is the dispatch of the boat *from the slip* despite adverse weather warnings. If this be proven and causal relationship established, it is of no import where the resulting accident took place, because the negligence charged is within the hazard insured (*Youghiogheny & Ohio Coal Co.* v. *Employers' Liability Assur. Corp.,* 114 F. Supp. 472, 475).

Since the complaints in the wrongful death actions allege that Carroll was an independent contractor and that the negligent acts of the assureds at the premises covered by the policy resulted in the wrongful deaths, we cannot here say that the assureds will be exonerated. If they are held liable, then the plaintiff would be required to indemnify.

The principle that " the duty to defend is broader than the duty to pay " is now beyond cavil (*Goldberg* v. *Lumber Mut. Cas. Ins. Co.,* 297 N. Y. 148, 154). The plaintiff by its policy assumed the duty to defend the assureds " even if such suit is groundless, false or fraudulent " (Par. II [a]). If, as we here hold, the complaints in the actions for wrongful death are sufficient, then the plaintiff is required to defend irrespective of the ultimate liability of the assureds (*Grand Union Co.* v. *General Acc. Fire & Life Assur. Corp.,* 254 App. Div. 274, 280, affd. 279 N. Y. 638; *Summer & Co.* v. *Phoenix Ind. Co.,* 265 App. Div. 911, affg. 177 Misc. 887; *Pow-Well Plumbing & Heating* v. *Merchants Mut. Cas. Co.,* 195 Misc. 251).

We are urged to find that the plaintiff, in the event that its coverage limit is exhausted, will not be required to continue the defense of any action then pending or any new actions thereafter commenced. Research fails to disclose any decision in this State precisely in point. Presumably such contention is based upon the premise that the payment of total indemnification terminates the policy. This might be so if the agreement to defend were a stipulation subordinate to and dependent upon the agreement to indemnify (*Lumbermen's Mut. Cas. Co.* v. *McCarthy,* 8 A. 2d 750 [N. H.]). We are not unmindful of the determination in the *McCarthy* case (*supra*). The dissent, however, held that the majority disregarded the language of the contract and construed the promise of the company to defend " not as an undertaking for the benefit of the assured, but as a stipulation for the benefit of the insurer." (P. 753.)

As we read the policy, the obligation to defend applies to accidents within the scope of the hazards covered during the calendar life of the contract (i.e., the one-year period specified therein). Nowhere is there language making the defense provisions dependent upon the exhaustion of the specified coverage. The phraseology used by plaintiff (Insuring Agreement II), " as respects the insurance afforded by the other terms of this policy the company shall: (a) defend *any suit* against the insured " (emphasis supplied), is clear, positive and unambiguous and should be accorded its plain and ordinary meaning (*Goldberg* v. *Lumber Mut. Cas. Ins. Co., supra; American Cas. Co. of Reading, Pa.* v. *Howard,* 187 F. 2d 322, 326). If plaintiff intended to reserve the right to withdraw counsel and cease to defend such actions as might be pending after payment of the total amount for which it indemnified, or to refuse to defend any new action commenced after such payments, it was under a duty to so state in the policy which it issued. The

language required is such as would be clear and comprehensible to the average business man without legal assistance (*Whiteside* v. *Insurance Co. of Pa.*, 274 App. Div. 36; *Birnbaum* v. *Jamestown Mut. Ins. Co.*, 298 N. Y. 305, 312).

The provisions to defend the assureds in the policy are basically similar to those in *City Poultry & Egg Co.* v. *Hawkeye Cas. Co.* (297 Mich. 509), in which the unanimous decision states (p. 512): "We are of the opinion that the undertaking to defend and the undertaking for payment of damages were severable and independent." To like effect are *Union Ind. Co.* v. *Mostov* (41 Ohio App. 518), and *Hoosier Cas. Co.* v. *Chimes,* (95 F. Supp. 879, 883, 884).

The Circuit Court of Appeals (*American Cas. Co. of Reading, Pa.* v. *Howard, supra*) in construing a policy (p. 326) with provisions strikingly similar to those under consideration here, unanimously said: "We agree with the District Court that American is obligated to defend, on behalf of Elias Howard, the pending suit against him under the South Carolina Survival Statute. There is no merit in the contention of American that, having paid the limit of its coverage for personal injuries and having indicated its willingness to pay for any property damages recovered in this pending suit up to the limit of its property coverage, it has completely fulfilled its obligations under the policy contract."

We hold therefore that the plaintiff is obligated to defend any action against the assureds based upon a wrongful death arising out of the foundering of the "Pelican".

The value of declaratory judgment actions is evidenced here. Procedure which permits this plaintiff to obtain a prompt determination of substantial rights rather than subject itself and its assureds to the discomfort and expense of uncertainty until the question of liability is tested, serves a salutary purpose.

It may not be inappropriate, at this time, to call attention to certain conduct, happily infrequent, that is occasionally apparent to the court at nisi prius. It should be emphasized, too, that these comments are in no way intended to reflect upon the *bona fides* of the litigants nor the integrity of counsel in this action.

There are instances when it appears that insurance coverage is inadequate to provide full restitution to an injured plaintiff. Nevertheless, under an unlimited agreement to do so, the insurance company assumes the expense of all the components of proper defense, however burdensome. The rights of the assured "go deeper than the mere surface of the contract written for

him by the defendant company " (*Brassil* v. *Maryland Cas. Co.*, 210 N. Y. 235, 242). When a casualty company defends its assured, it must be held to a strict rule of good faith upon assuming that responsibility (*New York Cons. R. R. Co.* v. *Massachusetts Bonding & Ins. Co.*, 193 App. Div. 438, 444, affd. 233 N. Y. 547; *Matter of Szabo* v. *Standard Commercial Body Corp.*, 221 App. Div. 722).

When counsel, although paid by the casualty company, undertakes to represent the policyholder and files his notice of appearance, he owes to his client, the assured, an undeviating and single allegiance. His fealty embraces the requirement to produce in court all witnesses, fact and expert, who are available and necessary for the proper protection of the rights of his client. It is immaterial that such procedure increases the cost to the carrier beyond the policy coverage limit.

The attorney may not seek to reduce the company's loss by attempting to save a portion of the total indemnity in negotiations for the settlement of a negligence action, if by so doing he needlessly subjects the assured to judgment in excess of the policy limit. His duty to the assured is paramount. The Canons of Professional Ethics make it pellucid that there are not two standards, one applying to counsel privately retained by a client, and the other to counsel paid by an insurance carrier (Canons of Professional Ethics, 6, 45). If the interests of the carrier and the assured are or are likely to become diverse, he cannot represent both. " Divided obligations in trust relations are obnoxious to the law, and in none more so than in that of attorney and client " (*People* v. *Peoples Trust Co.*, 180 App. Div. 494).

The late Chief Judge LEHMAN, in *Loew* v. *Gillespie* (90 Misc. 616, 619, affd. 173 App. Div. 889), clearly stated: " The relation of attorney to client is a high trust. * * * Not only may he do nothing adverse to his client but he may accept no retainer to do anything which might be adverse to his client's interests. These principles must be regarded as the foundation of all the rules which the courts and the leaders of the legal profession have announced as fixing the proper relations of attorneys and clients. Public policy absolutely demands that these foundations be not weakened * * * the essential question in each case is whether or not the attorney has accepted a retainer which is in any manner in conflict with his obligation to some other client."

It is our hope that these comments will help to rectify a problem that may tend to mar the proud chronicle of the Bar and the high principles it has set and maintained.

Settle judgment on notice in accordance with this decision made pursuant to section 440 of the Civil Practice Act.