PINE ISLAND FARMERS COOP,
et al., petitioners, Appellants,

v.

ERSTAD & RIEMER, P.A.,
et al., Respondents.

No. C1–01–670.

Supreme Court of Minnesota.

Aug. 22, 2002.

Dustan J. Cross, Gislason & Hunter, L.L.P., New Ulm, MN, for Appellants.

Kay Nord Hunt, Phillip A. Cole, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, MN, for Respondents.

Thomas H. Boyd, John A. Knapp, Winthrop & Weinstine, P.A., St. Paul, MN, (for Minnesota Chamber of Commerce, the Insurance Federation of Minnesota, and the American Insurance Association), Katherine E. Giddings, Katz, Kutter, Alderman, Bryant, and Yon, P.A., Tallahassee, FL, (for Insurance Federation of Minnesota and the American Insurance Association), John E. Simonett, Clifford M. Greene, John M. Baker, Greene Espel, P.L.L.P., Minneapolis, MN and John S. Pierce, Barger & Wolen, L.L.P., San Francisco, CA, (for American International Companies), Charles E. Lundberg, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, MN, (for Minnesota Defense Lawyers Association), for Amicus Curiae.

## OPINION

PAGE, Justice.

This case presents issues concerning the tripartite relationship between a liability insurer, an insured, and defense counsel hired by the insurer to defend a claim against the insured. The insurer in this case, appellant Farmland Mutual Insurance Company (Farmland), brought a legal malpractice action against defense counsel, respondents Erstad & Riemer, P.A., and attorneys Lawrence J. Skoglund and John R. Thomas (collectively, Erstad & Riemer), arguing that Erstad & Riemer represented both the insured, appellant

Pine Island Farmers Coop (Pine Island), and Farmland in an action brought by Duane Windhorst against Pine Island. The district court concluded that Erstad & Riemer did not represent Farmland, and that Farmland therefore could not maintain a legal malpractice action on its own behalf against Erstad & Riemer. The district court went on to conclude that Farmland, however, could maintain such an action on behalf of Pine Island under the doctrine of equitable subrogation.[1]

On appeal, the court of appeals affirmed the district court's conclusion that Erstad & Riemer did not represent Farmland, holding that "the insured is the sole client of the defense attorneys hired by the insurer." The court of appeals reversed the district court with respect to the issue of whether Farmland could maintain a legal malpractice action under the doctrine of equitable subrogation. The court of appeals held that the district court's conclusion on this point was inconsistent with Minnesota law, and that, in any event, Farmland had unclean hands and was therefore barred from seeking recourse in equity. We affirm, although on somewhat different grounds.

## I.

This case stems from an action brought by Windhorst against Pine Island as a result of Pine Island's sale and installation of a milk metering system on Windhorst's dairy farm in 1994. In 1996, Windhorst commenced an action against Pine Island for breach of contract, negligence, and breach of express warranties, alleging that, as a result of Pine Island's failure to properly install the milk metering system, a number of his dairy cows became con-taminated with bacteria. Pine Island tendered defense of Windhorst's claim to its liability insurer, Farmland, who retained Erstad & Riemer to represent Pine Island.

Windhorst's claim was tried to a jury in 1998. The jury found that both Pine Island and Windhorst were negligent, that their negligence was a direct cause of Windhorst's damages, and that Pine Island was 90% at fault. Based on this verdict, the district court entered judgment against Pine Island for $1,145,925, which represented 90% of Windhorst's damages as found by the jury. The district court denied Pine Island's post-trial motions seeking a new trial, remittitur, or judgment notwithstanding the verdict. Pine Island appealed the district court's order denying its post-trial motions to the court of appeals. In 1999, while Pine Island's appeal was pending, Windhorst and Farmland settled Windorst's claim for $1,050,000. As a result of the settlement, Pine Island's appeal was withdrawn.

Farmland and Pine Island commenced the present action against Erstad & Riemer for legal malpractice and breach of contract in 2000. The complaint alleged that both Farmland and Pine Island had an attorney-client relationship with Erstad & Riemer. In its answer to the complaint, Erstad & Riemer denied having an attorney-client relationship with Farmland. In addition, Erstad & Riemer, asserted a counterclaim against Farmland for unpaid legal fees.

The district court granted summary judgment for Erstad & Riemer with respect to Pine Island's claims, except for its claim that Erstad & Riemer committed legal malpractice by failing to commence a third-party action against the manufactur-

---

1. Under equitable subrogation, an insurer who pays a loss on behalf of its insured can pursue the insured's rights against third parties whose negligence or wrongful acts caused the loss. *See Medica, Inc. v. Atlantic Mut. Ins. Co.*, 566 N.W.2d 74, 77 (Minn.1997); *Travelers Indem. Co. v. Vaccari*, 310 Minn. 97, 99, 245 N.W.2d 844, 846 (1976).

er of the milk metering system, which was reserved for trial. The district court granted summary judgment for Erstad & Riemer with respect to all of Farmland's claims on the ground that Erstad & Riemer and Farmland did not have an attorney-client relationship and, thus, there was no basis for the claims. The district court noted that, under Minnesota law, attorney-client relationships can be created by contract, either express or implied, or through tort theory. Based on its analysis of the communications and interactions between Erstad & Riemer and Farmland, the district court concluded that Pine Island was Erstad & Riemer's sole client. The district court went on to conclude that, despite the lack of an attorney-client relationship between Erstad & Riemer and Farmland, Farmland could maintain an action for legal malpractice against Erstad & Riemer under the doctrine of equitable subrogation. After acknowledging that "there is no Minnesota law on this issue," the district court relied exclusively on *Atlanta International Insurance Co. v. Bell*, 438 Mich. 512, 475 N.W.2d 294 (1991), in which the Michigan Supreme Court applied the doctrine of equitable subrogation to allow a nonclient insurer to bring a legal malpractice claim against attorneys hired by the insurer to defend an action against the insured.

Rather than proceeding to trial, the parties stipulated that the efficient administration of justice would be aided by an immediate appeal of the issues decided by the district court. Pursuant to the parties' stipulation, the district court entered an appealable order dismissing with prejudice all of Farmland's claims[2] and all of Pine

Island's claims except for Pine Island's legal malpractice claim that had been reserved for trial. The order stayed that claim and the counterclaim brought by Erstad & Riemer.

Farmland and Pine Island appealed the district court's order. The court of appeals affirmed the district court's conclusion that Erstad & Riemer and Farmland did not have an attorney-client relationship, holding that "the insured is the sole client of the defense attorneys hired by the insurer." *Pine Island Farmers Coop v. Erstad & Riemer, P.A.*, 636 N.W.2d 604, 609 (Minn.App.2001). The court of appeals observed that this principle, although not "firmly established" in Minnesota law, was consistent with Minnesota case law and the Minnesota Rules of Professional Conduct. *Pine Island*, 636 N.W.2d at 608–09.

The court of appeals reversed the district court on the equitable subrogation issue, stating that the Michigan case relied on by the district court "was decided by a divided court and limited to the facts of that case."[3] *Id.* at 610. The court of appeals also noted that "the dissenting opinion is more consistent with prevailing Minnesota law prohibiting an assignment of legal malpractice claims." *Id.* Finally, the court of appeals explained that, because Farmland settled with Windhorst while Pine Island's appeal was pending and without consulting Erstad & Riemer, Farmland had unclean hands and was therefore barred from seeking recourse in equity. *Id.* at 611.

---

**2.** The district court's dismissal with prejudice of all of Farmland's claims was inconsistent with its conclusion that Farmland could maintain a legal malpractice claim against Erstad & Riemer under the doctrine of equitable subrogation.

**3.** Given that the district court's order dismissed all of Farmland's claims, it is unclear what was accomplished by the court of appeals' reversal of the district court on this issue.

Farmland and Pine Island petitioned this court for review of the court of appeals' decision, and we granted the petition to consider two issues: first, whether Erstad & Riemer and Farmland had an attorney-client relationship; and second, if Erstad & Riemer and Farmland did not have an attorney-client relationship, whether Farmland can maintain a legal malpractice action against Erstad & Riemer under the doctrine of equitable subrogation.

## II.

■ Summary judgment is appropriate when "there is no genuine issue as to any material fact and * * * either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03; *Louis v. Louis,* 636 N.W.2d 314, 318 (Minn.2001). Our review of a summary judgment is limited to "whether there are any genuine issues of material fact and whether the district court erred in its application of the law." *Goins v. W. Group,* 635 N.W.2d 717, 722 (Minn.2001); *Ruud v. Great Plains Supply, Inc.,* 526 N.W.2d 369, 371 (Minn.1995). On appeal, the evidence must be viewed in the light most favorable to the party against whom the motion for summary judgment was granted. *Louis,* 636 N.W.2d at 318; *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993).

## III.

■ To prevail in its legal malpractice action, Farmland must establish that it had an attorney-client relationship with Erstad & Riemer.[4] *See Ross v. Briggs & Morgan,* 540 N.W.2d 843, 847 (Minn.1995); *Blue Water Corp. v. O'Toole,* 336 N.W.2d

279, 281 (Minn.1983). If Erstad & Riemer and Farmland did not have an attorney-client relationship, then Farmland's claims fail as a matter of law unless the doctrine of equitable subrogation applies. *See Rouse v. Dunkley & Bennett, P.A.,* 520 N.W.2d 406, 408 (Minn.1994); *Blue Water Corp.,* 336 N.W.2d at 282.

■ Farmland and Pine Island argue that we should apply the general rules regarding the formation of attorney-client relationships to determine whether Erstad & Riemer represented Farmland. Under those rules, a person seeking to establish the existence of an attorney-client relationship may do so using either contract or tort theory. *See Togstad v. Vesely, Otto, Miller & Keefe,* 291 N.W.2d 686, 693 (Minn.1980). A contract for legal services can be express or implied from the conduct of the parties. *Ronnigen v. Hertogs,* 294 Minn. 7, 11, 199 N.W.2d 420, 422 (1972); *see Togstad,* 291 N.W.2d at 693. Under tort theory, an attorney-client relationship is created when a person seeks and receives legal advice from an attorney in circumstances in which a reasonable person would rely on the advice. *Admiral Merchs. Motor Freight, Inc. v. O'Connor & Hannan,* 494 N.W.2d 261, 265–66 (Minn. 1992); *Togstad,* 291 N.W.2d at 693 n. 4. Farmland and Pine Island assert that the exchanges that took place between Erstad & Riemer and Farmland during the Windhorst litigation establish that they had an attorney-client relationship under either contract or tort theory.

In response, Erstad & Riemer argues that, at the outset of the representation, defense counsel's sole client is the insured.

---

**4.** We have recognized an exception to this rule, extending an attorney's duty to a non-client in a "narrow range of factual situations in which the client's sole purpose in retaining an attorney is to benefit directly some third party." *Marker v. Greenberg,* 313 N.W.2d 4, 5 (Minn.1981); *see Admiral Merchs. Motor Freight, Inc. v. O'Connor & Hannan,* 494 N.W.2d 261, 266 (Minn.1992). This exception is not implicated by the facts of this case, where Farmland retained Erstad & Riemer to represent Pine Island.

According to Erstad & Riemer, the question of whether defense counsel also represents the insurer is governed by our decision in *Shelby Mutual Insurance Co. v. Kleman,* 255 N.W.2d 231 (Minn.1977). Erstad & Riemer argues further that, under the principles discussed in *Kleman,* its sole client was Pine.Island.

■ It is well-established under our case law that defense counsel hired by an insurer to defend a claim against its insured represents the insured. *See Miller v. Shugart,* 316 N.W.2d 729, 733 (Minn. 1982); *Crum v. Anchor Cas. Co.,* 264 Minn. 378, 391–92, 119 N.W.2d 703, 712 (1963); *Newcomb v. Meiss,* 263 Minn. 315, 322, 116 N.W.2d 593, 598 (1962). Because defense counsel has an attorney-client relationship with the insured, defense counsel owes a duty of undivided loyalty to the insured and must faithfully represent the insured's interests. We explained in *Crum:*

> [A]n attorney retained by an insurer to defend its insured, as long as he represents the insured, is under the same obligations of fidelity and good faith as if the insured had retained the attorney personally. The relationship of client and attorney exists the same in one case as in the other.

264 Minn. at 392, 119 N.W.2d at 712 (footnote omitted). The court expressed the same idea in *Newcomb,* where we stated:

> [T]he idea of an attorney appearing adversely to the interests of his client is not only repugnant to the trust relations between lawyer and client but to the fundamental concept of justice itself. This rule applies with equal force to counsel who undertakes to represent a policyholder. He owes to the policyholder the same "undeviating and single allegiance" that he would owe to the insured if retained and paid by [the insured].

263 Minn. at 322, 116 N.W.2d at 598 (quoting *American Employers Ins. Co. v. Goble Aircraft Specialists, Inc.,* 205 Misc. 1066, 1075, 131 N.Y.S.2d 393, 401); *see Miller,* 316 N.W.2d at 733 ("The attorneys hired by [the insurer] * * * owe their allegiance to their clients, the insureds, to best represent their interests.").

■ Thus, it is clear that in an insurance defense scenario, defense counsel has an attorney-client relationship with the insured. A number of jurisdictions have gone a step further, holding that the insured is defense counsel's sole client, and prohibiting defense counsel from forming an attorney-client relationship with the insurer. *See, e.g., First Am. Carriers, Inc. v. Kroger Co.,* 302 Ark. 86, 787 S.W.2d 669, 671 (1990); *Higgins v. Karp,* 239 Conn. 802, 687 A.2d 539, 543 (1997); *Bell,* 475 N.W.2d at 295, 296; *In re Rules of Prof'l Conduct,* 299 Mont. 321, 2 P.3d 806, 814 (2000). The court of appeals arguably endorsed this view when it broadly held that "the insured is the sole client of the defense attorneys hired by the insurer." *Pine Island,* 636 N.W.2d at 609. However, we have never gone so far as to hold that defense counsel cannot have an attorney-client relationship with both the insured and the insurer, *see Kleman,* 255 N.W.2d at 235; *Friesen's, Inc. v. Larson,* 443 N.W.2d 830, 831 (Minn.1989), and we decline to do so now.

In *Kleman,* we considered whether a law firm representing an insurance company could represent an insured in the same matter. 255 N.W.2d at 235. One of the opposing parties in that litigation moved the district court to enjoin the law firm that was representing the insurance company from also representing the insured, arguing that there was a conflict of interest between the insurance company and the insured. *Id.* The district court denied the motion and we affirmed. *Id.* We iden-

tified three reasons for allowing the dual representation to go forward. First, we noted there was "no apparent conflict [of interest]" between the insurance company and the insured. *Id.* Second, the insured had consulted with an independent attorney, and that attorney had advised the insured that obtaining separate counsel was unnecessary. *Id.* Finally, the insured had given his express consent to the dual representation "with knowledge of the circumstances." *Id.*

Consultation and consent were important to our holding in *Kleman* because the interests of the insured and the insurer may conflict, making it difficult for defense counsel to remain loyal to and exercise his or her independent professional judgment for the benefit of each client. The problems caused by conflicts of interest are particularly acute in the insurance defense context, where the potential for conflict exists in every case and actual conflicts are frequent. *Bell,* 475 N.W.2d at 297 (stating that "courts and commentators recognize universally that the tripartite relationship between insured, insurer, and defense counsel contains rife possibility of conflict" and that the "interest[s] of the insured and the insurer frequently differ"); *In re Rules of Prof'l Conduct,* 2 P.3d at 813 (recognizing the "stark reality that the relationship between an insurer and insured is permeated with potential conflicts"); Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 7.6(a)(1), at 809–10 (1988) (noting the "very substantial prospect that actual or potentially conflicting interests between an insurer and an insured will exist in regard to almost any tort claim that may be covered by liability insurance" and listing common sources of conflict).

Liability insurance contracts grant the insurer rights to participate in and, in some areas, control the defense of claims against the insured. *See* Keeton & Widiss, *Insurance Law* § 7.6(b), at 822 (stating that "[l]iability insurance policies typically include provisions that both obligate the insurer to provide the insured with a defense *and* entitle the insurer to control the defense"); Charles Silver, *Does Defense Counsel Represent the Company or the Insured?,* 72 Tex. L.Rev. 1583, 1594–95 (1994) (discussing insurers' contractual rights to control the defense of claims against the insured). As a result, defense counsel and the insurer inevitably share information about claims. With defense counsel and the insurer in frequent contact over the details of the litigation, the insurer has ample opportunity to inform defense counsel how different approaches to the claim might affect its interests. When the interests of the insurer differ from those of the insured, defense counsel who represents both may find itself in what we have called "an exceedingly awkward position." *Kleman,* 255 N.W.2d at 235 (quoting *Crum,* 264 Minn. at 391, 119 N.W.2d at 711).

The danger is that, if a conflict of interest does arise, the nature of the tripartite relationship makes it likely that defense counsel will tend to favor the interests of the insurer at the expense of those of the insured. As one commentator has stated, defense counsel "may be tempted to help the client [the insurer] who pays the bills, who will send further business, and with whom long-standing personal relationships have developed." Ronald E. Mallen & Jeffrey M. Smith, 4 *Legal Malpractice* § 29.16, at 325 (5th ed.2000). Similarly, the Eighth Circuit Court of Appeals explained:

Even the most optimistic view of human nature requires us to realize that an attorney employed by an insurance company will slant his efforts, perhaps unconsciously, in the interests of his real

client—the one who is paying his fee and from whom he hopes to receive future business—the insurance company. *United States Fid. & Guar. Co. v. Louis A. Roser Co.*, 585 F.2d 932, 938 n. 5 (8th Cir.1978).

As these authorities suggest, it may be rather difficult for defense counsel who represents both the insured and the insurer to provide the insured with "the same 'undeviating and single allegiance' that he would owe to the insured if retained and paid by [the insured]." *See Newcomb*, 263 Minn. at 322, 116 N.W.2d at 598. In this way, permitting dual representation can cause damage to the relationship between defense counsel and the insured by eroding the insured's trust and confidence in defense counsel's ability to faithfully represent his or her interests.

■ Despite the unique characteristics of the tripartite relationship between defense counsel, insurers, and insureds, Farmland and Pine Island argue that we should simply apply the general rules regarding the creation of attorney-client relationships to the facts of this case to determine whether Erstad & Riemer represented Farmland. Although we agree that an insurer seeking to establish the existence of an attorney-client relationship with defense counsel can do so using contract or tort theory, *see Togstad*, 291 N.W.2d at 693, merely applying the general rules would not adequately address our concerns regarding dual representation in insurance defense cases. In light of the insurer's rights to control the defense of claims, exchanges of information between defense counsel and the insurer—including exchanges in which the insurer seeks, receives, and relies on legal advice from defense counsel—are bound to occur. Thus,

a holding that these exchanges, standing alone, are sufficient to create an attorney-client relationship between defense counsel and the insurer would result in a rule that defense counsel represents the insurer in virtually every insurance defense case. Furthermore, such a holding would allow defense counsel to represent the insurer without the insured's consent or knowledge of the significant risks posed by dual representation.

For these reasons, it would be inappropriate to look solely to the general rules to determine whether defense counsel had an attorney-client relationship with an insurer. Instead, it is more appropriate to supplement the general rules with the factors that motivated our decision to permit dual representation in *Kleman:* the absence of a conflict of interest between insured and insurer and the fact that the insured expressly consented to the dual representation after consultation with counsel. 255 N.W.2d at 235. This approach provides a bright-line rule to determine whether defense counsel represents the insurer as well as the insured. Without consultation and the express consent of the insured, the insured remains defense counsel's sole client. The twin requirements of consultation and consent make it impossible for the insurer to become defense counsel's co-client without the knowledge of the insured. It also comports with a lawyer's ethical obligations to consult with and obtain the consent of both clients when the lawyer seeks to represent multiple clients in the same matter. *See* Minn. R. Prof. Conduct 1.7(b).[5] Moreover, this approach protects insureds against the risk that defense counsel will favor the insurer in a conflict-of-interest situation by prohibiting the creation of an attorney-

---

**5.** By citing Rule 1.7(b), we do not mean to suggest that the existence of an attorney-client relationship between defense counsel and an insurer is conditioned on defense counsel's compliance with the rules of professional conduct.

client relationship between defense counsel and the insurer when there is a conflict. At the same time, the approach is not overly broad because it permits dual representation in cases where the interests of the insured are least likely to be ignored—that is, when there is no conflict of interest between the insured and the insurer and, after being informed of the risks and advantages of dual representation, the insured makes an informed decision that dual representation is appropriate.

■ Based on these considerations, we hold that, in the absence of a conflict of interest between the insured and the insurer, the insurer can become a co-client of defense counsel based on contract or tort theory if two conditions are satisfied. First, defense counsel or another attorney must consult with the insured, explaining the implications of dual representation and the advantages and risks involved. *See Kleman,* 255 N.W.2d at 235; Minn. R. Prof. Conduct 1.7(b)(2). Second, after consultation, the insured must give its express consent to the dual representation. *See Kleman,* 255 N.W.2d at 235.

We turn now to an application of our holding to the facts of this case. The record before us does not contain any evidence indicating that defense counsel or another attorney consulted with Pine Island regarding the possibility of dual representation. Nor is there any evidence that Pine Island, after being informed of the risks and advantages of dual representation, consented to dual representation. Based on these facts, we conclude that defense counsel did not represent Farmland in the Windhorst matter,[6] and we therefore hold that defense counsel is entitled to summary judgment with respect to

the legal malpractice action brought by Farmland on its own behalf.

## IV.

■ Having concluded that Farmland cannot maintain a legal malpractice action on its own behalf against defense counsel, we now address whether Farmland can assert Pine Island's rights against defense counsel by maintaining a legal malpractice action under the doctrine of equitable subrogation.

Farmland and Pine Island urge us to follow the Michigan Supreme Court's decision in *Bell* on this issue. In *Bell,* the Michigan Supreme Court applied the doctrine of equitable subrogation to allow a nonclient insurance company to sue defense counsel for legal malpractice. 475 N.W.2d at 298–99. The insured in *Bell* did not bring a legal malpractice claim against defense counsel. *See id.* at 296. The court's holding was motivated, in part, by the concern that defense counsel would escape malpractice liability if the insurance company was not permitted to go forward with its claim. The Michigan Supreme Court explained: "defense counsel's immunity from suit by the insurer would place the loss for the attorney's misconduct on the insurer. The only winner produced by an analysis precluding liability would be the malpracticing attorney. Equity cries out for application under such circumstances." *Id.* at 298.

In this case, Pine Island has brought a malpractice action against Erstad & Riemer. Consequently, a holding that Farmland cannot bring an equitable subrogation claim will not have the effect of rendering Erstad & Riemer immune from malprac-

---

**6.** Because we have disposed of this issue on the grounds that there was no consultation and no consent, we need not apply contract or tort theory to the communications between Erstad & Riemer and Farmland, and we need not consider whether there was a conflict of interest between Pine Island and Farmland.

tice liability. Thus, the reasoning of the Michigan Supreme Court in *Bell* does not apply to the present case. Similarly, because Pine Island has sought to vindicate its own rights by bringing a malpractice action in its own name, there is no need to allow Farmland to step into Pine Island's shoes to assert Pine Island's rights. Therefore, based on the particular facts and circumstances of this case, we decline to apply the doctrine of equitable subrogation, and we affirm the district court's order dismissing with prejudice all of Farmland's claims.

Affirmed.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILBERT, Justice (concurring in part, dissenting in part).

Today, the majority establishes new standards regarding the formation of an attorney-client relationship. These new standards are based on the presumption that even in the absence of a conflict of interest between the insured and the insurer, the insured is defense counsel's sole client. Under the majority's approach, an insurer cannot become a co-client of defense counsel based on contract or tort theory unless two conditions are met. First, defense counsel or another attorney must consult with the insured and explain the implications, advantages, and disadvantages of dual representation. Second, the insured must give express consent to the dual representation after such consultation. Applying these new standards, the majority concludes that because there was no evidence in the record that defense counsel consulted with the insured regarding dual representation and there was no evidence that the insured consented to dual representation, defense counsel did

not represent the insurer in the Windhorst case. The majority also declines to apply the doctrine of equitable subrogation to permit the insurer to assert a malpractice claim against defense counsel.

Although I concur with the majority's opinion regarding equitable subrogation, I respectfully dissent from the majority's opinion as to whether the insurer had an attorney-client relationship with defense counsel. Under our traditional contract and tort principles, when an individual is licensed as a lawyer, looks like a lawyer, sounds like a lawyer, acts like a lawyer, gives advice like a lawyer, bills like a lawyer, and the client believes he is being represented by a lawyer, the client is being represented by a lawyer. The majority, however, chooses to depart from these traditional principles and sets forth additional criteria that must be satisfied to establish an attorney-client relationship. The majority adopts this approach because it is concerned that a potential conflict of interest between the insured and the insurer might lead defense counsel to favor the interests of the insurer at the expense of the insured. However, the majority does not explain why the insured needs such additional protections when there is no actual conflict of interest but only a potential conflict of interest. Indeed, under the facts of this case, there was a unity of interest between the insured and the insurer.

Under our traditional contract and tort principles, when a party seeks legal advice from an attorney and the attorney gives that party legal advice, an attorney-client relationship exists. *See Togstad,* 291 N.W.2d at 693. In this case, the insurer retained defense counsel. Matters of legal strategy relating to investigation, experts, and the appropriate affirmative defenses were discussed and decided by defense counsel and the insurer. For example,

defense counsel sought specific approval from the insurer for agreeing to toll the statute of limitations to delay the commencement of the lawsuit and decided not to interplead a third party. There is no indication that these issues were even discussed with the insured. In fact, the law firm did not even meet with the insured until two months after a claim was presented. The billing instructions for representing the insurer or the insured states that "the parties shall be represented," indicating that dual representation was contemplated by the insurer and the insured.

Despite the fact that under traditional contract and tort principles an attorney-client relationship existed between the insurer and defense counsel, the majority chooses to depart from these traditional principles and sets forth additional criteria that must be satisfied to establish an attorney-client relationship. The majority is concerned that a potential conflict of interest between the insured and the insurer might lead defense counsel to favor the interests of the insurer at the expense of the insured. However, in dual representation situations, the potential for conflict of interest is always present. It is only when an actual conflict arises that the insured may need the protection from the possibility, if any, of defense counsel favoring the interests of the insurer at the expense of the insured. When an actual conflict arises, however, and it is not handled properly by defense counsel, the insured may sue defense counsel for malpractice and/or bring an ethics complaint. The solution is not to establish a bright-line rule as a matter of law that no attorney-client relationship existed between defense counsel and the insurer such that the insurer has no standing to bring a malpractice claim. We have never used our rules of professional conduct as the basis for a legal malpractice action or for a defense to a malpractice action.

It is ironic that the majority uses this case as a vehicle for establishing new standards to protect the insured from a potential conflict of interest when the facts of this case indicate that there was a unity of interest between the insurer and the insured. The source of the insurer's malpractice claim against defense counsel is that defense counsel failed to assert a limitation of remedy defense as an affirmative defense in the Windhorst suit. This limitation of remedy defense was specified on the back of the contract that formed the basis for the entire Windhorst suit. The reason that defense counsel did not assert this defense is that defense counsel did not even read the contract in preparing its answer and defenses, even through trial. In fact, the lawyer testified at a deposition that he first saw the contract when he and respondent law firm were sued for legal malpractice by the insurer. Significantly, this limitation of remedy defense limits the damage exposure of both the insured and the insurer. On this issue and the other affirmative defenses, there was obviously not only a dual representation with no actual or apparent conflict between the insurer and the insured, but there was a unity of interest to mitigate damages for both the insurer and insured. Because both the insured and the insurer are plaintiffs and appellants in this case, this unity of interest between the insurer and the insured has apparently continued throughout this litigation.

The practical effect of the new standards promulgated by the majority is to grant attorneys a shield of immunity from malpractice claims when there is no conflict of interest between the insurer and the insured. In this case, the insurer paid the judgment at issue and the insured had no meaningful monetary damages except a

deductible of $10,000. Now, the majority denies the insurer any effective recourse to even have its claim heard. I would hold that there was an attorney-client relationship between defense counsel and the insurer such that the insurer had standing to bring a malpractice action against defense counsel.

PAUL H. ANDERSON, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Gilbert.