Cody v. Cody, No. 525-9-04 Wncv  (Katz, J., May 4, 2005)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                      SUPERIOR COURT
Washington County, ss.:              Docket No. 525-9-04 Wncv


CODY

v.

CODY and CODY and
CODY CHEVROLET, INC.



ENTRY



        This case follows the shifting sands of family disputes, shifting stock ownership in and management of the family automobile dealership, shifting estate plans by the parents, and apparently shifting parental affections. Plaintiff William Cody, having been stripped of his one-time management and expectation of inheritance of a majority share of the business, now is suing his parents and the corporation.  He seeks at the outset to disqualify Gravel and Shea, long-time attorneys for the parents and the corporation, from representing Defendants.

        The following facts are derived from the two affidavits of William

and the affidavits of Attorneys Shea and Post. We emphasize that the factual allegations in the Shea and Post affidavits leave those of William's affidavits largely uncontested.

Gravel and Shea, and particularly Charles Shea, began representing William's parents in 1985 primarily for estate planning purposes. Estate planning included a "stock purchase agreement" whereby William and brother Robert Jr. would obtain ownership and control of the family business, Cody Chevrolet, Inc., before or upon the deaths of their parents. William and Robert Jr. were working at Cody Chevrolet at that time; other siblings apparently were not. The agreement permitted gifts of stock from the parents prior to their deaths, and required payments from the brothers to their parents' estates upon their deaths. William asserts that his father promised him, before and in the course of executing this agreement, that he (William) would end up with a controlling 51% of the stock and his brother (Robert Jr.) would end up with 49%. Gravel and Shea represented the corporation over the years in addition to the parents, though the record is not wholly clear as to the full scope and duration of the corporate representation.

Several years later, Attorney Shea met with Robert Sr. as well as both sons. Robert Sr. advised that he wished to begin gifting stock to the sons. It was made clear at the meeting that William would be the majority shareholder. The gifting, however, was conditioned, on Attorney Shea's advice, on stock transfer agreements between the corporation and the brothers that significantly restricted the stock owned by the brothers at that time and to be acquired in the future. Neither of the parents were parties to these agreements, which Attorney Shea drafted and the sons signed in 1994.

Robert Sr. was semi-retired at this point, and William was the corporation's general manager, responsible for daily operations and all "non-family" business decisions. It was not unusual in this period for William to contact Attorney Shea by telephone to discuss matters of concern related to the business, a practice that William continued until

Attorney Shea's semi-retirement in 1997 or 1998.

Not long after the 1994 agreements were signed, at a meeting of Attorney Shea, Robert Sr., and William, it was determined that Robert Jr. would be terminated from the corporation both as an employee and as a stockholder, all as a result of the belief that Robert Jr. had acted in some inofficious way to compromise the corporation. Attorney Shea advised that Robert Jr.'s rights under the 1985 agreement should be terminated. Robert Sr. decided at this meeting that, rather than having another child assume Robert Jr.'s position with respect to the 1985 agreement, William alone would "own the Company." Attorney Shea recommended the termination of another sibling from employment at the corporation since she would not be acquiring stock. Amendments to the 1985 and 1994 agreements were signed by Robert Jr.; William signed on behalf of the corporation.

At about the this time, William came to believe that his mother and one or more siblings were opposed, contrary to his father's expressed intentions, to his acquisition of controlling stock ownership of the corporation, and were planning to prevent it. As a result, William became very interested in and concerned about his rights under the 1985 agreement. Prompted by these circumstances, William eventually contacted Attorney Shea by telephone. A meeting between Attorney Shea and William, and no one else, ensued. As we consider this meeting particularly significant, we quote at length the description of it provided in the parents' legal memorandum:

> The third meeting William describes related to the Company and Robert Cody [father]. It took place on May 21, 1996. William had telephoned Mr. Shea to request that meeting. William's primary purpose in arranging the meeting was to determine the status of paperwork for 1996 gifts to him of Company stock. William also told Mr. Shea about certain

3

> corporate and family developments. As reflected in Mr. Shea's summary notes, William (i) asked about the "status re stock" gifts from his parents; (ii) stated that Robert [Sr.] was contemplating acquiring property from his (Robert's) brother, Donald, and gifting it to six children–but not William–and that documents "will be forwarded"; (iii) advised that the issue with respect to Bob [Jr.] was unresolved and that Robert [Sr.] "will call" me to discuss it . . . . In his affidavit, William claims that he and Mr. Shea discussed documents "in some detail." While it is possible that Mr. Shea told William what the Stock Purchase Agreement provides (Mr. Shea does not recall the specific discussion), he would not have said that there is "nothing else [William] needed to do to protect [his] interests," since Mr. Shea would not have reviewed the documents from that perspective; that is, Mr. Shea was not representing William and was not retained to protect his interests.

Memo in Opposition, 4-5. This matter is being decided on the papers; to do so we must determine that there is no material dispute of fact requiring the taking of testimony. In reviewing this description of the 1996 meeting, we take careful note of its final sentence. That sentence does not actually provide evidence, for Shea does not actually recall any offered facts. Instead, the sentence draws a conclusion about what Attorney Shea would not have done, because he did not, as a matter of law, consider William to be his client. Hence, when Defendants state the facts as "it is possible that Mr. Shea told William what the Stock Purchase Agreement provides" and William states "When I asked him to explain what would happen if my father died first, he retrieved the agreements and told me that I would end up being the majority shareholder," William Cody Affidavit, ¶29 (12/13/04), those facts are not at all contradictory.

4

This meeting occurred when William was the dealership general manager; no one else was at the meeting, which was billed to the corporation. Worried about a family cabal, he asked about the security of his right to become the controlling stockholder. At a minimum, Attorney Shea answered the question by reading from pertinent documents. It would be wholly naïve, however, to believe that Shea limited his response to merely reading from the document, and engaged in no explanation, assurance, or interpretation. But there is really no need to draw such an obvious inference from the undisputed facts.

William left the meeting believing his right to control the corporation was secure, and he did not pursue the issue further at that time. The following year, Robert Jr. again became employed by the corporation. Again concerned about his right to control to corporation, William contacted Attorney Post about the impact of Robert Jr.'s return. In his 12/13/04 affidavit, William describes Attorney Post's responses as reassuring him that nothing needed to be done to protect his interests. William eventually came to some agreement with his parents whereby he (William) would receive 55% of the stock up front, and Robert Jr. would receive 45% over time. Attorney Post was to handle related arrangements. After a dispute with Robert Jr. about the legal effect of being a 45% owner of the company, William claims that he contacted Attorney Post to inquire about his rights as a 55% owner. William alleges that Attorney Post reassured him that as a 55% owner he would control the corporation's affairs.

With regard to the above contacts between William and Attorney Post, Attorney Post states in his affidavit only the following: "on a couple of occasions between 1997 and 2000, I had brief telephone conversations with William regarding various aspects of stock transfers proposed by William's parents; however, those conversations were in the nature of imparting specific information to William regarding the status of the

5

transfers . . . ." William Post Affidavit, ¶3.

William then contacted another attorney who at the time regularly represented the corporation, and who was not affiliated with Gravel and Shea, to ask about the implications of 55% stock ownership. That attorney declined to advise William, indicating instead that William should seek his own counsel as he was requesting personal legal advice. William did so. William's deal with his parents eventually fell through; this appears to be one of the precipitating events giving rise to this case.

William repeatedly states in his affidavits his belief that Attorney Shea, and then Attorney Post, represented his personal interests. He knew that they represented his parents, and the corporation, but he believed they represented the family's interests, and his personally, throughout this long course of events. Attorney Shea has not contested William's numerous claims that Attorney Shea never once in the course of estate planning or corporate representation indicated to William that Attorney Shea did not represent William's personal interests, or that, in light of obviously adverse corporate and family interests, William should retain his own counsel.

With regard to representation, Attorney Post states only this:

> William and I both serve on the Board of Trustees at Champlain College. On several occasions during events at the College, William engaged me in conversations regarding the transactions with his parents. These conversations made me very uncomfortable, due to the fact that our clients were the senior Codys. In those conversations, I told William, and he acknowledged, that his parents were our clients, that I could not get specific with him about anything his parents were doing, and that he would have to get information from them.

6

William Post Affidavit, ¶4. This statement is significant for three reasons. First, it is vague; it does not specifically state that Attorney Post advised William that Attorney Post did not represent William or that William might be well advised to get his own representation; William believed that Gravel and Shea represented the family, not just his parents. Second, it generally concedes the nature of William's contacts with Attorney Post: William was concerned about his right to control the corporation in light of how estate plans and family relationships were unfolding. Third, this conversation occurred after the vast majority of William's other contacts with Attorneys Shea and Post.

In determining whether disqualification is warranted, we first look to whether a professional relationship ever arose between Plaintiff and Gravel and Shea. The test is whether Plaintiff, a non-lawyer, believed that Gravel and Shea represented his personal interests, and that belief, in the totality of the circumstances, was objectively reasonable. See Kilpatrick v. Wiley, Rein & Fielding, 2001 UT 107, ¶ 49; Pine Island Farmers Coop v. Erstad & Riemer, P.A., 649 N.W.2d 444, 448 (Minn. 2002); Responsible Citizens v. Superior Court, 20 Cal.Rptr.2d 756, 766 (Cal. Ct. App. 1993) (citing Friedman, The Creation of the Attorney-Client Relationship: An Emerging View, 22 Cal.Western L.Rev. 209, 231 (1986)). What Attorneys Shea and Post personally believed is not relevant to this inquiry. See Westinghouse Elec. Corp. v. Kerr-McGee Corp., 580 F.2d 1311, 1319 n.14 (7th Cir. 1978).

An attorney representing a corporation, even a closely held corporation owned and run by a small group of family members, does not for that reason alone thereby represent the shareholders personally. See Bovee v. Gravel, 174 Vt. 486, 487-88 (2002) (mem.). The test remains whether the individual reasonably believed the attorney was providing personal representation. In making this determination in this case, we bear

7

in mind that that the situation with representation of a closely held corporation can be fraught with ambiguity to the non-attorney shareholder if the corporate attorney does not affirmatively clarify exactly who the client is. See Nancy J. Moore, Expanding Duties of Attorneys to "Non-Clients": Reconceptualizing the Attorney-Client Relationship In Entity Representation And Other Inherently Ambiguous Situations, 45 S.C. L. Rev. 659, 667-73 (1994); see also Karen Saulsberry, Beyond the Attorney-Client Relationship: The Implied Professional Relationship, 18 J. Legal Prof. 351, 351-52 (1993).

Separately, the same ambiguity may arise when an attorney represents a family member about matters concerning other family members.

> When a lawyer represents a family member, particularly in matters relating to the family, there is often confusion regarding who it is the lawyer represents. Indeed, the dangers in this context may be even greater than in entity representation. Unlike corporate lawyers, who frequently are clear in their own mind that they are lawyers for the corporations and not the constituents, "lawyers faced with requests for . . . family representation are often unable unequivocally to identify 'the client.'" Perhaps this inability is because a family, unlike a business, is not ordinarily viewed as an entity (even by lawyers), but rather as a collection of individuals whose goals are sometimes shared and sometimes in conflict.

Saulsberry, supra, 696 (footnotes omitted). The competing interests and expectations are exemplified by the exception to the privity requirement between estate lawyers and estate beneficiaries in legal malpractice cases. See Bovee, 174 Vt. at 488 (privity rule commonly relaxed in estate planning

8

context where client's purpose to benefit third party).

This case presents a long history of corporate and family representation, each evincing just this sort of ambiguity. The recurring issues involved in the representation related to ownership and control of the corporation as they would pass from one generation to the next, intermingling corporate and family issues together. The situation in this case is worsened by the longstanding lack of shared interests among family members and, for that matter, among shareholders. There is no dispute that William has always wanted control of the corporation and that the plan, at least for many years, was to make that happen. There is also no dispute, however, that family disagreements threatened that outcome for a protracted period, and eventually prevented it. Lastly, there is no real dispute that William, who several times approached Gravel and Shea with his concerns about his rights, was never explicitly advised that Gravel and Shea did not represent him personally, that Gravel and Shea represented the parents, the corporation, and no one else.

In these confusing circumstances, the burden of clarifying who the client was, and was not, fell squarely upon Attorneys Shea and Post, not William. William offers unrebutted evidence that he subjectively believed that Gravel and Shea represented him personally. Did he do so reasonably? We conclude that he did.

Defendants do not contest that the subject matter of that representation relates substantially to the subject matter of this case. See State v. Crepeault, 167 Vt. 209, 216 (1997) (discussing the substantially-related-matter requirement). Indeed, the subject matter is largely the same. Hence, we need not more closely examine William's claims that he revealed information to Gravel and Shea that he would have considered confidential had he understood that Gravel and Shea did not represent him. The divulgence of confidential information to Gravel and Shea is presumed.

9

See id. at 216-17.

We therefore find a conflict of interest in Gravel and Shea's continued representation of Defendants in this case.  Plaintiff's motion for disqualification is granted.

Dated at Montpelier, Vermont, _____, 20__.

_____
Judge

10